**In re Harnam S. ARNEJA, Respondent.**

**No. 01–BG–61.**

District of Columbia Court of Appeals.

Argued Jan. 9, 2002.

Decided Jan. 31, 2002.

David Schertler, with whom Barry Coburn, Washington, was on the brief, for respondent.

Julia L. Porter, Senior Assistant Bar Counsel, with whom Joyce E. Peters, Bar Counsel, was on the brief, for the Office of Bar Counsel.

Elizabeth J. Branda, Executive Attorney, for the Board on Professional Responsibility.

Before TERRY, FARRELL, and WASHINGTON, Associate Judges.

FARRELL, Associate Judge.

As of January 2000, Rule 1.15(d) of the District of Columbia Rules of Professional Conduct provides that "[a]dvances of unearned fees and unincurred costs shall be treated as property of the client ... until earned or incurred unless the client consents to a different arrangement." The present disciplinary matter, however, arose in the context of the predecessor Rule 1.15(d), which specified that "[a]dvances of legal fees and costs become the property of the lawyer upon receipt."[1]

---

1. Both the predecessor and the present rule, of course, require the return to the client of

Respondent (Arneja) received certain Personal Injury Protection (PIP) insurance payments while representing two clients and an estate in connection with a personal injury suit he was engaged to file. Although he used a portion of these receipts to pay personal expenses (leaving his trust account at various times below the amount of the received payments), the Board on Professional Responsibility rejected Bar Counsel's charge of misappropriation because it found that the clients had consented to Arneja's use of the PIP funds to pay expected litigation expenses, thereby making them his property under former Rule 1.15(d). At the same time, the Board found that Arneja had violated Rule 1.15(a) (commingling), Rule 1.15(b) (failure to notify and promptly deliver funds to clients and/or third parties), Rule 1.16(a) (failure to withdraw from representation after notification of discharge), Rules 1.8(i) and 1.16(d) (failure to surrender files on termination of representation), and Rule 8.4(c) (conduct amounting to dishonesty, fraud, deceit, and/or misrepresentation). The Board recommends that Arneja be suspended from the practice of law for one year.

Bar Counsel contests the Board's failure to find misappropriation of client funds on two grounds. First, she argues that the PIP payments did not lose their character as client funds entrusted to Arneja merely because he was permitted to use them to pay litigation costs. Second, she contends the record shows at most that the clients consented to use of a portion, but not all, of the PIP funds for litigation expenses. Arneja, for his part, contends mainly that

the record fails to establish either commingling or dishonesty—the latter based partly on his having filed the personal injury suit naming himself as the attorney of a client who had fired him. We accept the Board's findings and recommendation, and therefore order respondent's suspension for one year.

## I.

The Hearing Committee of the Board found that Arneja, a solo practitioner, agreed to represent Arcadio Gonzalez, the estate of Mr. Gonzalez's deceased wife (Ana Edith Rodriguez), and Reyna Castillo in connection with a claim for damages arising from a May 1993 automobile accident in which a tree fell on the car Mr. Gonzalez was driving, killing Ms. Rodriguez and injuring Mr. Gonzalez and Ms. Castillo. In February 1994 Arneja received a PIP insurance check for $2,500 payable to Mr. Gonzalez, and in March 1994 he received a second PIP check for $2,500 payable to Ms. Castillo. He endorsed both checks and deposited them in his trust account. Minus litigation expenses of $365 at the time, the monies received from the Gonzalez/Castillo clients totalled $4,635. Between February and July 1994 Arneja transferred funds from the trust account to his operating account (and vice-versa) to pay business and/or personal expenses,[2] with the result that in June and again in July the balance in the trust account had dipped well below the PIP payments received minus litigation expenses. The same thing occurred after November 1994 when Arneja received a PIP check from Mr. Gonzalez's insurer

any unearned portion of advanced legal fees and unincurred costs at the termination of the lawyer's services.

**2.** On more than one occasion during this period, Arneja withdrew sizeable funds from the trust account by checks made payable to cash.

During the same time, he deposited checks into the trust account including one payable to clients Kiran Suri and Ramesh Suri and himself as their attorney; and soon afterwards he wrote a check to the Suris in "full and final settlement" of a claim.

payable to the Rodriguez estate. Between November and late January 1995, he drew checks payable to "Arneja's Law Office" on the trust account and deposited them in the operating account, leaving a February 1995 balance in the trust account well below the combined PIP payments received less litigation expenses ($761.66 by then) and a $1,000 "loan" he had made to Mr. Gonzalez from the operating account.

The Hearing Committee further found that in April 1995 Mr. Gonzalez retained new counsel (Joseph Malouf) to represent him in his personal injury claim, and that around May 1, 1995, Arneja received a letter from Gonzalez terminating his representation and asking him to send the case file to successor counsel. Between May and December 1995 Malouf repeatedly asked Arneja to turn over the Gonzalez file, but Arneja refused to do so until his "investment of time and money" in the case could be discussed. In late December 1995 Arneja delivered some documents concerning his representation of Gonzalez to Malouf, but did not deliver any of the PIP funds held in trust for Gonzalez or the Rodriguez estate. In a June 1996 letter to Bar Counsel Arneja characterized his refusal to turn over the Gonzalez file as the exercise of his right to protect his "appreciable investment" in the case.

On or about October 2, 1995, following his discharge by Gonzalez, Arneja filed a complaint in the United States District Court for the District of Columbia entitled *Gonzalez, et al. v. United States Park Service*,[3] naming himself as attorney for Mr. Gonzalez, the Rodriguez estate, and Ms. Castillo. Subsequently, in February 1996 Arneja gave Castillo a trust account check for $2,300 along with a letter, which she signed, confirming his authority to represent her. In a July 1996 letter Castillo discharged him as her lawyer and asked him to send her file to Malouf. In January 1997 Arneja tendered three checks payable to Malouf as successor counsel, each representing part of the PIP payments. In the meantime, contrary to Mr. Gonzalez's expectation that PIP money would be used to pay his medical bills, Arneja did not pay those bills, and Mr. Gonzalez's wages ended up being garnished by the Washington Hospital Center where he had received treatment.

## II.

The issue of most consequence dividing the parties is whether, as Bar Counsel contends, Arneja misappropriated client funds by using the PIP payments to pay personal (business or other) expenses, thus letting his trust account balance fall below the amounts entrusted to him on behalf of Gonzalez, Castillo, and the Rodriguez estate. The Hearing Committee concluded, and the Board agreed, that if the PIP payments were deemed to be client funds, Arneja's failure to keep records and repeated disregard of the trust account balance would constitute reckless misappropriation, *see In re Anderson,* 778 A.2d 330 (D.C.2001), presumptively requiring disbarment. *See In re Addams,* 579 A.2d 190 (D.C.1990) (en banc).[4] The Hearing

---

**3.** The basis for the federal suit was apparently negligent maintenance of the tree in question by the Park Service.

**4.** The Hearing Committee found that Arneja "felt no compelling need to keep track of the funds received from clients" because, according to his testimony, he kept a separate $10,000 certificate of deposit as a "backup" escrow account if needed. As the Board recognized, we rejected such reliance on a companion savings account in *In re Pels,* 653 A.2d 388, 394 (D.C.1995), stating that "[a] trust account is a trust account, not one dependent on discretionary infusions of money from another source."

Committee and the Board concluded, however, that Bar Counsel had failed to prove by clear and convincing evidence that the PIP payments were client funds, given testimony by Arneja and other witnesses that the clients had consented to use of the PIP funds for litigation expenses, thus making them "property of the lawyer" under Rule 1.15(d), as then formulated.

Bar Counsel initially contends that even if Gonzalez and Castillo gave Arneja permission to use the PIP funds to pay litigation costs, "the character of the PIP funds did not change—they remained client funds which [he] had authority to use only for litigation purposes," not personal expenses. We agree with the Board that this confuses the present rule with the former one. Although an attorney *now* is obligated under Rule 1.15(d) to hold advances of unincurred costs and unearned fees in trust unless the client consents to a different arrangement, under former Rule 1.15(d) he had no such obligation. The advances became his property which he was authorized to place in his operating account and treat as his own. *See In re Mitchell*, 727 A.2d 308, 311 n. 2 (D.C.1999) (advances of legal fees are properly deposited in operating account); *In re Osborne*, 713 A.2d 312 (D.C.1998) (commingling found where attorney deposited advance fees and expenses in trust account); *In re Powell*, 646 A.2d 340, 344 & n. 14 (D.C. 1994) (recognizing that under former disciplinary rule a charge of misappropriation could be avoided by showing that client funds had been "transmuted into advances for costs and expenses").

Admittedly, as the Board stated, it "appears anomalous that the character of [the PIP] funds should be converted from entrusted funds to attorney funds by the simple fact that [Arneja] was entitled to use the funds for litigation expenses." Indeed, as Bar Counsel points out, Arneja's actual belief at the time was that the funds were not his and that he held them in trust, mistakenly thinking he fulfilled that duty by keeping other funds—a certificate of deposit, see note 4, *supra*—in reserve in case they were needed to cover client obligations. But Rule 1.15(d) as written at the time controls this issue. That it provided Arneja (and possibly other lawyers) "an unexpected technical defense," in the Board's words, may have something to do with why it was later changed, but the Board is correct in its conclusion that the consent Arneja had received to use the payments for litigation costs stripped them of their identity as client funds under the rule then prevailing. Stated differently, Arneja's trust obligation at the time regarding these funds was limited to making prompt repayment of unearned fees and unaccrued expenses if and when his services were terminated.

Bar Counsel, however, goes on to dispute the Hearing Committee's finding that consent had been given to use of *all* the PIP funds for litigation costs. She says no evidence was presented that Arneja received permission to spend the PIP payment to Ana Edith Rodriguez's estate for that purpose, whatever may be said of the payments to Gonzalez and Castillo. This argument implicates the deference that both the Board and this court are required to give to factual findings of the Hearing Committee, see D.C. Bar Rule XI, § 9(g), especially those resting—as here—on credibility determinations. *See In re Micheel*, 610 A.2d 231, 234 (D.C.1992). The Committee credited testimony by Arneja and other witnesses that at his initial meeting with Gonzalez and Castillo, both clients agreed to Arneja's use of the PIP payments to fund the expected litigation. All three insurance payments, for relatively modest amounts, were made pursuant to Gonzalez's automobile insurance policy, and nothing in the record suggests that he

limited his consent to their use to funds payable to him directly and not to his deceased spouse.[5] Moreover, at the time the consent was given, Gonzalez was the most likely person to be designated his wife's personal representative, clothed with authority to advance money supporting litigation that could benefit her estate. That it was Arneja who in fact became the personal representative does not, in our view, affect the application of Rule 1.15(d) to Arneja's handling of the PIP funds once Gonzalez's consent had been given.

■ To establish misappropriation Bar Counsel had to prove "by clear and convincing evidence that the client did not consent to the attorney's use of the funds." *In re Shelly,* 140 N.J. 501, 659 A.2d 460, 466 (1995); *see In re Ingram,* 584 A.2d 602, 602–03 (D.C.1991); *In re Gilchrist,* 488 A.2d 1354, 1357–58 (D.C.1985). We see no reason to disturb the conclusion that, in light of Arneja's explanation, Bar Counsel failed to prove that he lacked consent to use the PIP payments for litigation costs, without differentiation among the payees. *See Anderson,* 778 A.2d at 337 (attorney's explanation is "circumstantial evidence which the Board may consider, along with all the other evidence," in determining whether Bar Counsel has met her burden of proving misappropriation (quoting *In re Thompson,* 579 A.2d 218, 221 (D.C.1990))).

### III.

■ Arneja, also excepting to the Board's recommendation, first challenges its finding that he commingled client and personal funds, an argument based on the fact that the PIP payments became his own property under Rule 1.15(d). But regardless of the status of the PIP funds,

Bar Counsel proved by clear and convincing evidence that Arneja had failed to keep fiduciary funds separate from his own. *See In re Hessler,* 549 A.2d 700 (D.C.1988). To illustrate, at about the same time Arneja held PIP funds in the trust account, he wrote a check on the account to another client (Singh) for $4,931 with the notation "full & final settlement of [illegible] claim." Even more plainly, on March 23, 1994, he deposited both a $24,000 settlement check received on behalf of clients Kiran and Ramesh Suri and $5,000 of his own funds into the trust account, and two days later wrote a check to the Suris for $12,238.34 with the notation "full and final settlement of [illegible] claim." The notion that all of these funds might have been Arneja's— either earned or by operation of Rule 1.15(d)—defies rational belief.

Arneja next concedes that he "technically violated" Rules 1.16(a) and 1.16(d) by not "acting faster and more proactively" in withdrawing from the case when he was asked to by Mr. Gonzalez, and in surrendering client files to successor counsel, Malouf. But he argues that those delays were in good faith, resulting from "confusing communications between himself and successor counsel" and from his legitimate efforts to assert a lien on his own work product for unpaid fees. *See* Rule 1.8(i). The failure to withdraw from the representation as requested is plain on the record. Though asked to cease representing Mr. Gonzalez around May 1, 1995, Arneja filed a complaint five months later in U.S. District Court still (falsely) representing that he was Gonzalez's counsel. The Board also found, with substantial support in the record, that Arneja's failure to surrender client files promptly was both obvious and unjustified by his reliance on Rule 1.8(i). First, Arneja's reliance on protecting his

---

**5.** Testimony allowed the Committee to find that everyone understood the litigation could

not be funded without using the PIP payments.

"work product" came only belatedly, and even after successor counsel agreed to protect his lien for work completed, he still did not turn over the Gonzalez file promptly. Second, Rule 1.8(i) precludes reliance on the work product lien if "withholding the lawyer's work product would present a significant risk to the client of irreparable harm." In a June 1995 letter to successor counsel Arneja acknowledged that the statute of limitations on Gonzalez's claim was in danger of expiring, yet by then he had turned over no files and in fact did not do so until late December 1995, and then only partially.[6] As the Board found, "[i]t took an extraordinary effort by Mr. Malouf, aided by Bar Counsel, to obtain even a partial turnover of files."

Arneja likewise failed promptly to deliver client funds once the representation terminated. As the Board found:

> They were not turned over until January 24, 1997, one year and one-half after his termination by Mr. Gonzalez in May 1995 and six months after his termination by Ms. Castillo in July 1996. He held onto the funds for almost a year after successor counsel acknowledged that he would recognize a lien against any settlement proceeds or recovery. And, while the funds were being withheld, the Washington Hospital Center pursued Mr. Gonzalez for its unpaid medical bills, obtained a judgment, and garnished his wages.

Neither "difficulties in communication" between Malouf and respondent, nor the fact that Bar Counsel had begun an investigation,[7] relieved Arneja of his duty to surrender funds that no longer belonged to him.

Finally, Arneja contests the Board's finding of dishonesty (Rule 8.4(c)) which rested both on his filing of the suit in District Court falsely naming himself as Gonzalez's counsel, and on misrepresentation to Malouf and Bar Counsel that he had turned over the entire client file as requested. Arneja argues that if he had not filed the complaint, Gonzalez and the Rodriguez estate would have lost their claim because Malouf was unaware "this was a federal case" and hence would have let the statute of limitations expire. But, as the Hearing Committee recognized, "one reason for successor counsel's inability to file a timely complaint was Mr. Arneja's failure to provide Mr. Malouf critical correspondence with the Park Service." See note 6, *supra*. Arneja's perceived eleventh-hour need to file the complaint stemmed from his own non-cooperation with successor counsel, and was accompanied by dishonesty or misrepresentation within the meaning of our decisions. *See, e.g., In re Shorter*, 570 A.2d 760, 768 n. 12 (D.C.1990) (" 'Deceit is the suppression of a fact by one who is bound to disclose it' ") (citation omitted); *In re Jones–Terrell*, 712 A.2d 496, 499–500 (D.C.1998) (dishonest conduct shown despite finding of no evil or corrupt intent); *In re Reback*, 487 A.2d 235 (D.C.1985), *vacated but adopted and incorporated in relevant part*, 513 A.2d 226 (D.C.1986) (en banc) (dishonesty in filing second complaint to replace one dismissed because of negligent inattention). Moreover, the record supports the Board's conclusion that Arneja, in his correspondence with Malouf and Bar Counsel, know-

---

6. As Bar Counsel points out, only in December did Arneja deliver to Malouf (a) the Form 95 that Arneja had filed with the Park Service apprising them of the clients' claims, and (b) the government's April 3, 1995, notice of denial of the claims, the latter informing them that they had six months remaining to contest the agency determination or file suit in federal court.

7. At this point, Arneja argues, he "did not want to take any action until directed to do so by Bar Counsel."

ingly fostered the erroneous impression that he had turned over all of the documents concerning the Gonzalez and Rodriguez representation.

### IV.

In recommending Arneja's suspension for one year, the Board remarked (among other things) that "Respondent was fortunate indeed to have the 'technical' defense to misappropriation afforded by the application here of Rule 1.15(d)." Arneja argues that this comment taints the recommendation because he should not be penalized harshly for conduct that would be misappropriation "but for" the operation of an ethical rule on which he was entitled to rely. As pointed out earlier, of course, Arneja did not rely on the rule in fact: he believed the PIP funds were entrusted to him but relied (erroneously) on other means to insure their integrity. At all events, the Board found respondent's conduct to involve both "serious commingling and a careless disregard for appropriate record-keeping." And,

> [w]hile due to the operation of Rule 1.15(d), he did not engage in misappropriation, Respondent delayed far too long in returning the remaining PIP funds to his clients after he was discharged. Respondent refused to cooperate with new counsel, to the detriment of his clients, who were non-English speaking immigrants unfamiliar with the United States legal system. They were vulnerable and entitled to protection. Respondent's lack of cooperation led him to further misconduct, in the form of the complaint he filed, five months after his services were terminated and new counsel designated, falsely identifying himself as counsel. It took over one year and one-half, and repeated efforts by new counsel—and ultimately Bar Counsel—to obtain full release of client documents and the remaining PIP funds.

The Board thus found this to be a case of "aggravated failure to cooperate with successor counsel resulting in serious prejudice to vulnerable clients." It carefully arrayed our decisions presenting analogous circumstances and recommended a one-year suspension, though without a requirement to prove fitness for reinstatement. D.C. Bar R. XI, § 9(g)(1) " 'endorses the Board's exercise of broad discretion in handing out discipline that is subject only to a general review for abuse in that discretion's exercise.' " *In re Lopes,* 770 A.2d 561, 567 (D.C.2001) (quoting *In re Haupt,* 422 A.2d 768, 771 (D.C.1980) (per curiam)). Respondent's protracted withholding of client files and funds, combined with his commingling, careless recordkeeping, and material misrepresentations, all persuade us that the recommended sanction is in keeping with our past decisions, and so must be adopted.

Accordingly, respondent Harnam S. Arneja is hereby suspended from the practice of law for one year, without a requirement to show fitness. His attention is called to the requirements of D.C. Bar Rule 14; *see also* Rule 16(c).

*So ordered.*