*Notice:   This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters.   Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 19-BG-554

IN RE PAUL S. HAAR, RESPONDENT.

A Suspended Member of the Bar
of the District of Columbia Court of Appeals
(Bar Registration No. 368605)

On Report and Recommendation
of the Board on Professional Responsibility
(BDN-2012-D392; BDN-2013-D429)

(Argued September 23, 2020       Decided February 24, 2022)

*Daniel S. Schumack*, with whom *McGavock D. Reed Jr.* was on the brief, for Respondent.

*Jennifer Lyman*, Special Assistant Disciplinary Counsel, with whom *Hamilton P. Fox III*, Disciplinary Counsel, and *Myles Lynk*, Senior Assistant Disciplinary Counsel, were on the brief, for the Office of Disciplinary Counsel.

Before EASTERLY and MCLEESE, *Associate Judges*, and RUIZ, *Senior Judge*.

EASTERLY, *Associate Judge*:   The Office of Disciplinary Counsel charged immigration attorney Paul S. Haar with misappropriation and commingling of pre-paid flat fees in two separate cases involving two different clients, in violation of D.C. R. Prof. Conduct 1.15(e) as clarified in *In re Mance*, 980 A.2d 1196 (D.C.

2009) (requiring attorneys to deposit such in trust)[1]; *see also* D.C. R. Prof. Conduct 1.15(e). Departing from the Hearing Committee's recommendation, the Board of Professional Responsibility concluded that (1) there was no misconduct in the first case, wherein Mr. Haar failed to move into trust a partially unearned flat fee he had received before *Mance* was decided, and (2) Mr. Haar was merely negligent in the second case, when he failed to deposit or subsequently move into trust a partially unearned flat fee he received after *Mance* was decided. The Board recommended that Mr. Haar be suspended for seven months, followed by a one-year period of probation, during which he was to submit to an evaluation by the D.C. Bar's Practice Management Advisory Services (PMAS), and complete up to ten hours of CLE recommended by PMAS at its sole discretion. We agree with the Board that Mr. Haar should only be sanctioned for misappropriation and commingling in one of the two charged cases, and impose the Board's recommended sanction.

---

[1] When this court decided *Mance* this rule was denominated Rule 1.15(d). To avoid confusion, we refer to the past and current iterations of the rule as Rule 1.15(e) throughout this opinion.

## I. Factual and Procedural History

### A. Mr. Haar's Practice and the Legal Landscape Before the Charged Misconduct

Mr. Haar was admitted to practice law in the District of Columbia in 1983. A decade later, he founded the solo immigration practice he runs today, where he primarily accepts modest flat fees. Mr. Haar testified, and Disciplinary Counsel does not dispute, that his fees tend to be small because many of his cases take days or even hours from start to finish, and because many of his clients are low-income and pay him what they can afford in incremental amounts. At the time Mr. Haar started his practice, Rule 1.15(e) provided that any advances of legal fees for unearned work became the property of the attorney upon receipt. *In re Arneja*, 790 A.2d 552, 552–53 (D.C. 2002).

In 1997, this court held that Mr. Haar negligently misappropriated legal fees owed to him when he withdrew settlement funds held in trust[2] without his client's

---

[2] Lawyers in the District are required to hold entrusted funds in Interest on Lawyer Trust Accounts (IOLTA), https://www.dcbarfoundation.org/iolta; https://perma.cc/3ZQ4-A5M4 (last visited November 11, 2021), and we use the terms "trust account" and "IOLTA account" interchangeably in this opinion.

consent; accordingly, we imposed a thirty-day suspension as a sanction for his misconduct. *See In re Haar*, 698 A.2d 412 (D.C. 1997) (hereinafter *Haar II*); *see also In re Haar*, 667 A.2d 1350 (D.C. 1995) (hereinafter *Haar I*). We concluded that Mr. Haar's negligence was in good faith and stemmed from mistakes of both fact and law. *Haar II*, 698 A.2d at 421.

In 2000, the D.C. Bar amended Rule 1.15(e), essentially reversing its directive. In pertinent part, the amended rule requires that "advances of unearned fees . . . shall be treated as property of the client pursuant to paragraph (a) [requiring such property to be kept separate from the lawyer's property in a trust account] until earned . . . unless the client gives informed consent to a different arrangement." D.C. Bar R. I, § 15(e). But as we acknowledged in our 2009 opinion, *In re Mance*, the application of Rule 1.15(e) "to flat fees is not clear on its face." 980 A.2d at 1206. Accordingly, we clarified that flat fees are a type of advances of fees covered by Rule 1.15(e), because they consist of "money paid up-front for legal services that are yet to be performed." *Id.* at 1202, 1206. We further held that "the client should be informed that, unless there is agreement otherwise, the attorney must . . . hold the flat fee in escrow until it is earned . . . ." *Id.* at 1207. We stated that our holding applied only "prospectively," *id.* at 1199, but did not explain (because it was not an

issue presented to us) how prospective application of the rule should work. Consequently, we did not discuss whether and how attorneys should handle open client matters in which flat fees had already been paid. Neither Rule 1.15 nor its Comment section have ever been updated to reference *Mance*'s clarification or implications.

By his own admission, Mr. Haar did not keep up-to-date on changes to Rule 1.15(e) and its interpretation by this court.

## B. Ramiro Moya Fees

In 2008, a year before *Mance* was decided, Mr. Haar deposited in his operating account a $5,500 flat fee from Ramiro Moya, to assist Mr. Moya in obtaining an employment-based green card. Not long after, Mr. Moya's prospective employer withdrew sponsorship. Mr. Moya stated he would search for another employer, but he fell out of touch, and Mr. Haar suspended work on the case. Mr. Haar used the fees, which he had deposited into his operating account, as his own.

In 2010, Mr. Moya's wife unsuccessfully attempted to obtain a refund of her husband's fees, though it is unclear whether Mr. Haar was aware of her efforts. When new counsel for Mr. Moya requested the Moya file, Mr. Haar promptly complied. Around the same time (October 2012), Mr. Moya filed a bar complaint against Mr. Haar, alleging that Mr. Haar had taken $5,500 without doing the required work and asserting that he (Mr. Moya) was entitled to a refund. Mr. Haar asked a junior associate, Alex Miller, to research the proper method for refunding Mr. Moya, and Mr. Miller subsequently advised that the refund should come from a trust account. Mr. Haar deposited $5,500 in his IOLTA account[3] and refunded Mr. Moya in early November. The parties agree that because Mr. Haar had done some amount of work on the case, this refund was larger than the amount actually owed.

### C. Yalcin Gur Fees and *Mance* trainings

A few days before issuing Mr. Moya's refund, Mr. Haar agreed to represent Yalcin Gur in an unusually complex immigration marriage fraud case. A few days after issuing Mr. Moya's refund, Mr. Haar accepted from Mr. Gur a $10,000 flat fee,

---

[3] Mr. Haar testified before the Hearing Committee that he opened this IOLTA account in 2011 because he knew he had to have one, but he explained that he "misunderstood the proper use" of the account.

which Mr. Haar testified was a much larger pre-payment than those he typically received. Despite having just refunded the Moya fees from his IOLTA account, Mr. Haar deposited the Gur fees in his operating account, using at least some of the unearned fees as if they were his personal funds over the next year. The Gur matter was assigned to Mr. Haar's associate, Mr. Miller.

Meanwhile, in response to the Moya bar complaint, Mr. Haar arranged a firm-wide training with the PMAS in December 2012. At the training, Mr. Haar learned about *Mance* and brought his banking practices into compliance, but only with regard to cases that came into the firm after the training date. In 2013, he also took a CLE course on IOLTA accounts. Mr. Haar did not move the Gur funds into trust after either training.

When Mr. Miller left Mr. Haar's practice in August 2013, taking the Gur matter with him, he requested that Mr. Haar refund Mr. Gur $8,000 in allegedly unearned fees. Mr. Haar delayed in doing so (he later explained at the disciplinary hearing, *see infra* Part I.D., that he was waiting for Mr. Miller to provide records confirming how much work he had done on the case while at Mr. Haar's firm). The delay led Mr. Gur to file a bar complaint in November. Later that month, Mr. Haar

refunded Mr. Gur $8,000 from his operating account, but Mr. Haar still disagrees that he actually owed that amount.

### D. Hearing Committee and Board Findings

The Moya and Gur disciplinary matters came before the Hearing Committee in late 2017. The parties jointly stipulated that Mr. Haar had rendered partial, competent services to Mr. Moya and Mr. Gur, but that at least $1,000 of the fees in each matter were unearned. Disciplinary Counsel also introduced Mr. Haar's bank records to prove commingling and misappropriation before Mr. Haar refunded the fees. Mr. Haar stipulated that the facts showed commingling and misappropriation. *See In re Anderson*, 778 A.2d 330, 335 (D.C. 2001) (internal quotation marks omitted) (explaining that misappropriation includes "any unauthorized use of client's funds entrusted to [the lawyer] . . . whether or not [the lawyer] derives any personal gain or benefit therefrom"); *see also In re Gray*, 224 A.3d 1222, 1229 (D.C. 2020) (explaining misappropriation occurs when an attorney's account dips below the amount of the client's funds held in trust).

Mr. Haar maintained however that he handled the Moya and Gur fees in good

faith and he did not know that Rule 1.15(e) as interpreted in *Mance* required him to deposit pre-paid flat fees in trust. He explained that he "honestly didn't understand the *Mance* case" and that if he had, "[he] would have complied immediately." He noted that when he learned of *Mance* from PMAS, he immediately implemented changes to ensure flat fees paid in all incoming cases were deposited in his trust account. When questioned how that squared with his contemporaneous failure to move the Gur fees into trust, Mr. Haar answered that he did not realize he had an obligation to audit his existing caseload for instances of non-compliance with *Mance*.[4]

The Hearing Committee "credit[ed] [Mr. Haar's] testimony that he believed that client advances of fees became a lawyer's property upon receipt, consistent with the understanding of many D.C. Bar members before *Mance*." The Committee further acknowledged "that the evidence does not clearly or convincingly demonstrate that Respondent actually learned of the rule in *Mance* before Mr. Moya

---

[4] Mr. Haar also testified that he did not believe he had a *Mance* problem related to Mr. Gur's case because he had completed a substantial portion of work for Mr. Gur's case and had therefore "earned a significant amount of the fee." This testimony was later undercut by his stipulation, through counsel, that as of the December 2012 training, "there had not been a substantial amount of money earned on the [Gur] matter." Even so, the parties stipulated only that Mr. Haar owed at least $1,000 to Mr. Gur out of the $10,000 initial fee, *see supra* p. 8.

terminated [Mr. Haar] or before [Mr. Haar] refunded the unearned amount of Mr. Moya's prepaid fees." But the Hearing Committee concluded that (1) because Mr. Haar had ignored Rule 1.15(e) "either as amended in 2000 or as clarified by *Mance*," he had acted recklessly regarding the Moya fees, and (2) because Mr. Haar both refunded the Moya fees from trust and participated in trainings on *Mance*/IOLTA accounts, his "good-faith beliefs concerning his professional responsibilities" must have changed by the time (or shortly after) he received the Gur fees,[5] and thus he acted "at minimum reckless[ly]" and possibly "intentionally" by not receiving or moving them into trust. For this misconduct, the Committee recommended disbarment.

On review of the Hearing Committee's report and recommendation, the Board largely adopted the Committee's findings of fact and also made some supplemental findings, citing directly to the transcripts and exhibits in the Hearing Committee proceedings, *see infra* Part III. In its conclusions of law, the Board determined that Mr. Haar had not violated Rule 1.15(e) in his handling of Mr. Moya's flat fee and

---

[5] Even as it drew this conclusion, the Hearing Committee acknowledged that "the record contains no further evidence to show why [Mr. Haar] transferred the [Moya] funds from [his operating account] to [the trust account to make the transfer], and the Committee did not press the issue further, leaving the precise reason for doing so unclear."

dismissed the Moya charges, and determined that Mr. Haar was only negligent with respect to his handling of Mr. Gur's flat fee. As a sanction, the Board recommended a seven-month suspension followed by one year of probation with conditions.

Mr. Haar prophylactically sought review by this court, anticipating Disciplinary Counsel's argument that his conduct was more than negligent and therefore subject to presumptive disbarment under *In re Addams,* 579 A.2d 190 (D.C. 1990). As Mr. Haar anticipated, Disciplinary Counsel excepted to the Board's recommendation, and argues in its brief to our court that Mr. Haar at least recklessly violated Rule 1.15(e) in both the Moya and Gur matters and accordingly should be disbarred.

## II. Standard of Review

We accept the Board's factual findings if they are supported by substantial evidence in the record. D.C. Bar R. XI, § 9(h)(1). Although we defer to the Board's fact finding, the Board in turn must defer to the Hearing Committee's fact finding and "accept [those determinations], including credibility findings, if they are

supported by substantial evidence in the record." *In re Cleaver-Bascombe*, 892 A.2d 396, 401 (D.C. 2006). As for "ultimate facts" or legal conclusions, including whether the attorney's conduct was proven by clear and convincing evidence to be negligent, reckless, or more, we review de novo. *In re Micheel*, 610 A.2d 231, 234 (D.C. 1992). Finally, we generally "accept the recommended disposition of the Board 'unless to do so would foster a tendency toward inconsistent dispositions for comparable conduct or would otherwise be unwarranted.'" *In re Confidential (J.E.S.)*, 670 A.2d 1343, 1346 (D.C. 1996) (quoting D.C. Bar R. XI, § 9(g)(1)). Nevertheless, "[n]otwithstanding the deference accorded to the Board's factual findings and its recommendation, ultimately the system of attorney discipline, including the imposition of sanctions, is the responsibility and duty of this court." *In re Pleshaw*, 2 A.3d 169, 172 (D.C. 2010) (internal quotation marks, brackets, and ellipsis omitted).

## III. Analysis

Preliminarily, we address Disciplinary Counsel's argument that the Board exceeded its authority and "followed a pattern established in recent disciplinary cases . . . [of] revis[ing] the [Committee's] most significant underlying fact

findings." Such a pattern—if it exists—is not present here. The Board made additional findings of fact, as it is authorized to do. *In re Schwartz*, 221 A.3d 925, 929 (D.C. 2019) (recognizing that "[u]nder Board Rule 13.7 of the Board on Professional Responsibility, the Board can make findings of fact in the first instance" provided that "the evidence on the point is clear and convincing"). As for the Board's treatment of the Hearing Committee's factual findings, the Board's report rejects exactly two: (1) the Committee's inference that Mr. Haar learned of his duties from Mr. Miller and the PMAS/CLE trainings, and (2) its "skepticism as to [Mr. Haar's] forthrightness" in some aspects of his testimony. The first of these is arguably an "ultimate fact" which the Board must review de novo; at any rate, the Committee's inference was "not supported by substantial evidence in the record," *see Cleaver-Bascombe*, 892 A.2d at 402; *supra* note 5; *infra* Part III.B. On the other hand, the Committee's determination that "[a]t times [Mr. Haar's] testimony appeared guarded . . . [but we] did not consider [his] testimony dishonest," is undoubtedly a credibility assessment that should have been accorded deference, and the Board's deference was at least qualified by its "reject[ion] of any suggestion" that Mr. Haar was less than forthright. But we cannot agree that this rather modest reevaluation is of much import. Both the Board's legal conclusions and our own are grounded not in a dispositive assessment of whether to believe Mr. Haar's every word, but in an evaluation of what the Rules of Professional Conduct require and

whether Disciplinary Counsel carried its burden of proof.

## A. The Moya Matter

The Board rejected the Hearing Committee's determination that Mr. Haar was reckless in the Moya matter and determined that Mr. Haar did not engage in misconduct of any sort. Citing this court's decision in *In re Kanu*, 5 A.3d 1, 5 n.1, 17 n.4 (D.C. 2010), the Board reasoned that "[w]hen he received the fee from Mr. Moya [pre-*Mance*], [Mr. Haar]—as did others—treated it as his own and was free to spend it as he saw fit." Further, the Board explained that "[n]othing in *Mance* . . . supports . . . [the] notion that the Court intended to require [Mr. Haar] (and presumably, myriad other practitioners) immediately to audit all their *pending* flat fee cases, ascertain the amounts of any unearned fees, disgorge those funds, and place them in trust until 'earned.'" The Board concluded that if this "[c]ourt [had] intended members of the Bar to place in trust funds that had been received pre-*Mance* [but not yet fully earned at the time *Mance* was issued]" the court "would have . . . said so."

We agree with the Board that Mr. Haar's handling of the Moya fees is not sanctionable misconduct. Mr. Haar should not be sanctioned for failing to take affirmative steps to place previously received flat fees in trust, when it was quite unclear from *In re Mance* that he was required to take such steps. To begin with, *Mance* itself was an acknowledgement that Rule 1.15(e) did not provide clear guidance as to flat fees. And when we used our decision in *Mance* to clarify that rule, holding that flat fees were a type of advance fees, we expressly stated that that holding was only "prospective," 980 A.2d at 1206, at least suggesting that already received flat fees (like the Moya fees) were grandparented.[6]

We therefore sustain the Board's dismissal of the Moya matter.

## B. The Gur Matter

The Board also rejected the assessment of the Hearing Committee that Mr.

---

[6] Indeed, discipline in the form of public censure was imposed in *Mance* only because counsel had commingled funds and failed to return the flat fee after the representation had ended, not because counsel had failed to move this money to a trust account in conformance with the newly announced interpretation of Rule 1.15(e). *Mance*, 980 A.2d at 1208.

Haar recklessly, if not intentionally, misappropriated Mr. Gur's funds, instead concluding that Disciplinary Counsel had failed to prove that this misconduct was more than negligent. Again, we agree. The record evidence does not support reckless—much less intentional—misappropriation, but it does support a finding of negligent misappropriation.

An attorney who misappropriates client funds may be deemed to have acted recklessly when they demonstrate a "conscious indifference to the consequences of [their] behavior for the security of the funds." *In re Anderson*, 778 A.2d at 339. This conscious indifference is displayed by an attorney's knowledge either of "the serious danger to others involved in [their banking practices]" or, more normatively, of "facts that would disclose *this* [*serious*] *danger* to any reasonable person." *Id.* (emphasis added) (internal quotation marks omitted). By contrast, we have held that the "hallmarks [of negligence] include a good-faith, genuine, or sincere but erroneous belief that entrusted funds have properly been paid; and an honest or inadvertent but mistaken belief that entrusted funds have been properly safeguarded." *In re Abbey*, 169 A.3d 865, 872 (D.C. 2017), *as amended* (Oct. 19,

2017).[7]

The burden is on Disciplinary Counsel to prove state of mind, *In re Anderson*, 778 A.2d at 339, and if it does not prove intentional or reckless misappropriation by clear and convincing evidence, it has "proved no more than simple negligence." *In re Ray*, 675 A.2d 1381, 1388 (D.C. 1996); *see also In re Gray*, 224 A.3d at 1229 ("There must be something more before a misappropriation will cross the line between simple negligence and recklessness."). Moreover, the burden of proof does not shift simply because an attorney attempts to give an explanation for his conduct. Although "the inadequacy (or non-existence) of [an] attorney's explanation for the use of client funds . . . [is] circumstantial evidence" which the Board may consider in reviewing whether Bar Counsel has proven a more culpable state of mind, this explanation must be examined "along with all the other evidence." *In re Anderson*, 778 A.2d at 337 (discussing dishonest misappropriation) (internal quotation marks omitted).[8]

---

[7] *But see Haar II*, 698 A.2d at 427 (Ruiz J., dissenting) ("Under traditional concepts of negligence, an honest but mistaken belief does not constitute negligence . . . without a further showing that it was unreasonable to hold that belief.").

[8] *See also In re Anderson*, 778 A.2d at 337 ("The *Addams* sanction of near-automatic disbarment for misappropriation resulting from more than negligence is a

With these principles in mind, we turn to the Hearing Committee's assessment of Mr. Haar's conduct in the Gur matter. The Committee "credit[ed] [Mr. Haar's] testimony that [originally] he believed that client advances of fees became a lawyer's property upon receipt, consistent with the understanding of many D.C. Bar members before *Mance*." But the Committee found that Mr. Haar's "understanding" of the proper way to treat flat fees changed after Mr. Miller informed him that the Moya fees needed to be refunded from trust. It concluded that Mr. Haar's "transfer of Mr. Moya's funds from his COA to his IOLTA *demonstrates* that [he] no longer maintained a good-faith but mistaken belief that a client's advance of flat fees became his property upon receipt . . . ." (emphasis added). In other words, if Mr. Haar knew that Mr. Moya needed to be refunded from an IOLTA, he must have known flat fees needed to be deposited in trust upon receipt, and he therefore acted at least recklessly—and possibly intentionally—in not moving Mr. Gur's fees into trust.

This inference is inadequately supported. As the Board observed, "[t]here is

---

strict one; it should not be triggered . . . solely by proof . . .—even by clear and convincing evidence—that the attorney let the funds in his operating account drop below the obligated level, leaving it to him to prove that he lacked the requisite intent or level of culpability.").

simply no evidence that [the interactions between Mr. Haar and Mr. Miller] had anything to do with *Mance* or with the treatment of flat fees upon their receipt"; indeed, Mr. Miller (who had his own interest in the Gur matter, *see supra* Part I.C) was never called to testify. It is true that an attorney's compliance with a rule can indicate an "awareness" of the rule. *See In re Pleshaw*, 2 A.3d 169, 173–74 (D.C. 2010) (the fact that attorney properly withdrew his initial fee as a conservator only after requesting and receiving court permission was evidence of his conscious indifference to the rules when he later paid himself commissions from estate funds without court permission). But there is no indication that Mr. Haar understood Mr. Miller's advice about refunding fees to be grounded in a more general rule governing the treatment of flat fees upon receipt. And while the Committee noted that it did not "find [Mr. Haar's] claim of good-faith mistake credible," and that his testimony "describing the advice he received from [Mr.] Miller" was "guarded," these findings do not lift the burden of proof from Disciplinary Counsel's shoulders. Indeed, the Committee itself noted that despite Disciplinary Counsel's argument, the content of the conversation with Mr. Miller "remained unclear." *See supra* note 5. The Committee's conclusion that Mr. Haar knew or had reason to know of the strictures of Rule 1.15(e) because of an opaque conversation with a non-testifying person cannot be sustained.

The Committee also concluded that Mr. Haar gained actual knowledge of *Mance* at his PMAS and CLE trainings. It is undisputed that Mr. Haar learned about *Mance* from PMAS. But "[t]here is no evidence . . . that the PMAS representative told [Mr. Haar to] . . . audit his pending files," or that the question of how to bring existing cases into compliance was addressed in the CLE class. Indeed, none of Disciplinary Counsel's exhibits mention, let alone answer, questions regarding *Mance*'s application to pending cases. The three *Washington Lawyer* articles discussing *Mance* focus entirely on how attorneys should handle fees upon receipt, as does Ethics Opinion 355 (providing guidance on *Mance*). Likewise, the submitted list of CLE classes discussing *Mance* or IOLTA accounts offers no indication that pending cases were covered in those sessions.[9] Moreover, we find it difficult to square the notion that Mr. Haar learned of his auditing duties under *Mance* with the undisputed fact that he made extensive efforts to ensure *Mance* compliance going forward. After arranging and participating in the PMAS training, "he hired knowledgeable counsel[,] . . . recrafted his written fee agreements and developed multilingual client-intake scripts that were *Mance* compliant"; he also registered for

---

[9] Granted, once this court clarified the meaning of Rule 1.15(e) in *Mance*, attorneys should not have placed unearned flat fees (like the Gur fee) in a non-trust account. But given that the D.C. Bar continued to explain *Mance* in trainings and articles for at least seven years following its issuance, it is fair to assume that Mr. Haar was not the only attorney who failed to put unearned flat fees into trust in the years following *Mance*.

and took the aforementioned CLE class.  For all these reasons, the record does not support a conclusion that he intentionally disobeyed the rule's application to the Gur matter.

Nor did the Committee provide adequate support for a determination by clear and convincing evidence that Mr. Haar was "conscious[ly] indifferen[t] to the consequences of his . . . behavior"; i.e. that he was aware of facts which *should* have put him on notice of a "serious danger to others." *In re Anderson*, 778 A.2d at 339. The Committee blamed Mr. Haar's inattention to legal education for his confusion about *Mance*'s application to the Gur matter.  To be sure, Mr. Haar's inattention to continuing legal education is lamentable.  *See In re Smith*, 817 A.2d 196, 202 (D.C. 2003).  By his own admission, Mr. Haar simply did not take active steps to stay updated on the field of legal ethics.  However, we cannot say that this inattention automatically renders him "consciously indifferent" with respect to *any* violation of the Rules of Professional Conduct, regardless of context:  indeed, in this case, we conclude that it did not.  Mr. Haar's clients typically did not pay large fees and had their matters resolved quickly, and thus his cases were not often pending for very long:  the Gur matter was exceptional.  Thus, even a more diligent Mr. Haar may have had little reason to consider *Mance*'s application to unearned flat fees.  Or to

put it differently, "[t]he question" of how *Mance* applied to unearned fees "may have seemed beside the point to [Mr.] Haar, and thus he may not have mentally addressed" it. *Haar II*, 698 A.2d at 421.[10] Moreover, as discussed, the proper interpretation of Rule 1.15(e) has been the subject of substantial confusion, and the rule still has not been updated to reflect *Mance*, despite 1) this court's conclusion that "[t]he rule's application to flat fees is not clear on its face," *In re Mance*, 980 A.2d at 1206, and 2) the fact that the rule now imposes essentially the opposite restriction to that which it required when Mr. Haar began his career. Thus we conclude that a practitioner who operated according to Mr. Haar's typical fee arrangements could reasonably fail to perceive such a danger, especially if the trainings he attended never mentioned it.

The lack of reckless misappropriation "hallmarks," *In re Anderson*, 778 A.2d at 338, bolsters our conclusion that Disciplinary Counsel did not prove recklessness to a clear and convincing degree. We have held the hallmarks of reckless misappropriation to include:

---

[10] Nor are we persuaded that Mr. Haar's prior suspension put him on any special notice of serious danger such that it weighs in favor of a higher degree of culpability. His discipline occurred over a decade earlier, involved an entirely distinct aspect of Rule 1.15, and happened prior to the rule changes which caused so much confusion in the present case. *See Haar I*, 667 A.2d at 1351–53.

> the indiscriminate commingling of entrusted and personal funds; a complete failure to track settlement proceeds; total disregard of the status of accounts into which entrusted funds were placed, resulting in a repeated overdraft condition; the indiscriminate movement of monies between accounts; and the disregard of inquiries concerning the status of funds.

*Id.* Certainly, Mr. Haar commingled funds. But Disciplinary Counsel has never contended a "complete failure to track settlement proceeds" or a "repeated overdraft" on his sweep account.[11] Likewise, there is no contention that Mr. Haar indiscriminately moved money between accounts or ignored inquiries from clients about the status of funds. Of course, the *Anderson* hallmarks are just that: hallmarks, not an exhaustive set of criteria. *See In re Gray*, 224 A.3d at 1231. But their absence is a further indication that Mr. Haar lacked the requisite "conscious indifference" to

---

[11] To the contrary, it seems the sweep account was designed to *prevent* any overdraft. According to SunTrust Bank's own explanation:

> At the end of each business day, Business Sweep calculates the net available balance position in your commercial checking account and then compares the result to a predetermined target balance. Then, if your net cash position is greater than your target balance, Business Sweep automatically uses excess funds to pay down your line of credit, or transfers excess funds into an investment vehicle that you select. If your net cash position is less than your target balance, Business Sweep automatically transfers funds from your chosen investment vehicle to cover the shortage or borrows the necessary funds against your line of credit.

be adjudged reckless.

Mr. Haar was, however, negligent. As a member of the Bar, Mr. Haar had a duty to keep himself reasonably informed of his obligations under the Rules of Professional Conduct from the text and commentary of the Rules and as interpreted by this court. We specifically reject any argument that he could be subject to sanction for violating Rule 1.15(e) only after he personally learned of *Mance*'s clarification of the rule. Mr. Haar—like all practitioners—was obligated to follow Rule 1.15(e) as interpreted by *Mance* upon our issuance of that decision. He should have understood when he received a flat fee from Mr. Gur in 2012—three years after *Mance* made clear that, per Rule 1.15(e), flat fees were advance fees—that he had to deposit that money in a trust account. And his failure to understand and conform with Rule 1.15(e) as interpreted by *Mance* three years after we issued that decision clearly amounts to negligent misconduct.

**IV. Sanction**

Generally, a "sanction recommendation from the Board comes to us with a

strong presumption in favor of its imposition." *In re Rodriguez-Quesada*, 122 A.3d 913, 920 (D.C. 2015) (internal quotation marks omitted). We "shall adopt the recommended disposition of the Board unless to do so would foster a tendency toward inconsistent dispositions for comparable conduct or would otherwise be unwarranted." *Id.* (citing D.C. Bar R. XI, § 9(h)(1)) (internal quotation marks omitted). Here, we agree with the Board's conclusion that Mr. Haar was negligent only in the Gur matter and accept also the Board's recommended sanction: a seven-month suspension plus one year of probation, to include a PMAS evaluation and CLE recommended by PMAS at its discretion.

"The purpose of imposing discipline is to serve the public and professional interests identified and to deter future and similar conduct rather than to punish the attorney." *In re Rodriguez-Quesada*, 122 A.3d at 921 (internal quotation marks omitted). In assessing Mr. Haar's negligence in the Gur case, the Board demonstrated fidelity to this principle. The Board thoughtfully and appropriately considered a number of relevant factors, including "(1) the seriousness of the conduct, (2) prejudice to the client, (3) whether the conduct involved dishonesty,[12]

---

[12] Though Disciplinary Counsel appears to object to the Board's "revisit[ing] of Mr. Haar's" honesty, it also acknowledges that "no one has claimed Mr. Haar gave sanctionable false testimony." We agree.

(4) violation of other disciplinary rules, (5) [Mr. Haar's] disciplinary history [which the Board noted was a "substantial aggravating factor"], (6) whether [Mr. Haar had] acknowledged his . . . wrongful conduct, and (7) mitigating circumstances," *In re Martin*, 67 A.3d 1032, 1053 (D.C. 2013), *as amended* (Oct. 23, 2014); the Board also reviewed cases comparable to Mr. Haar's. Mindful that "[a] six-month suspension without a fitness requirement is the norm for attorneys who have committed negligent misappropriation of entrusted funds," *In re Edwards*, 870 A.2d 90, 94 (D.C. 2005), the Board recommended a harsher sanction in Mr. Haar's case in order to impress upon the District's attorneys that "every lawyer—regardless of his or her employment, area of practice or level of seniority—should read, become familiar with, understand, and adhere to the Rules of Professional Conduct and the Court's decisions applying those Rules." Accordingly, it recommended a seven-month suspension, followed by a one-year period of probation with conditions.

We therefore suspend Mr. Haar for seven months for negligent misappropriation under Rule 1.15(e) in the Gur matter, after which we impose a one-year period of probation, during which Mr. Haar must submit to a PMAS evaluation and complete up to ten hours of CLE recommended by PMAS at its sole discretion.

*So ordered.*