### In re Robert W. MANCE, III.

### A Member of the Bar of the District of Columbia Court of Appeals (Bar Registration No. 285379).

### No. 06–BG–890.

District of Columbia Court of Appeals.

Argued Oct. 5, 2007.

Decided Sept. 24, 2009.

As Amended and Reissued Oct. 29, 2009.

---

1198 

Jacob A. Stein, Washington, with whom George A. Fisher was on the brief, for respondent, Robert W. Mance, III.

Elizabeth A. Herman, Deputy Bar Counsel, with whom Wallace E. Shipp, Jr., Bar Counsel, and Judith Hetherton, Senior Assistant Bar Counsel, were on the brief, for the Office of Bar Counsel.

Elizabeth J. Branda, Executive Attorney, filed a statement in lieu of brief, for the Board on Professional Responsibility.

Before RUIZ, BLACKBURNE–RIGSBY, and THOMPSON, Associate Judges.

RUIZ, Associate Judge:

This case presents us with the question whether a "flat fee" paid in advance for legal services is to be deemed an "advance[ ] of unearned fees" that is required to be treated as property of the client under Rule 1.15(d) of the D.C. Rules of Professional Conduct. The Board on Professional Responsibility ("Board") determined that a flat fee paid in advance of services being rendered becomes the attorney's property upon receipt, and, in the alternative, found that, even if the flat fee remains the client's property under Rule 1.15(d), the client in this case consented to having the fee treated as belonging to the attorney, as permitted by the rule. The Board recommends, however, that because respondent, Robert W. Mance, III, did commingle his funds (*i.e.*, the flat fee) by placing part of it in a client trust fund, he should be sanctioned with a public censure. Respondent concurs with the Board's recommended sanction. Bar Counsel disagrees with the Board's interpretation of the rule and with its alternative finding of client consent, and urges the court to impose a harsher sanction of suspension on respondent than the public censure recommended by the Board. We agree with Bar Counsel, that for purposes of Rule 1.15(d), money paid by a client as a flat fee for legal services remains the client's property, and counsel may not treat any portion of the money otherwise until it is earned, unless the client has agreed otherwise. As we announce this interpretation of the rule for the first time in this case, however, we apply it prospectively, and we adopt the Board's recommendation that respondent receive a public censure for commingling funds.

## I. Factual Summary

On December 2, 2003, William Saunders retained respondent to represent his son, who was a suspect in a homicide case. Respondent told Mr. Saunders that his fee would be $15,000—with the initial installment of $7,500 to be paid up-front—and possibly an additional $5,000 for investigative services "depending on what was involved." The second installment of $7,500 was to be paid after Saunders's son turned himself in to the police. Without any further discussion about the fee, Mr. Saunders agreed and paid respondent the initial $7,500. Although they did not discuss how the money would be kept, respondent placed most of it, $6,010, in a client escrow account, and the rest in his operating account.

After having talked to the son, who said that he would not be ready to turn himself in for another month (in January 2004), respondent decided to wait until that time to take any action. Mr. Saunders, however, became frustrated with respondent, who appeared to him to be doing nothing on his son's behalf, and terminated his services in early January 2004.[1] Respondent agreed to return the initial $7,500 payment, but did not do so until several months later because he did not have the funds readily available.

On May 27, 2004, Saunders filed a complaint with Bar Counsel claiming that re-

spondent had failed to return the money as promised. After receiving the $7,500 from respondent a week later, however, Mr. Saunders told Bar Counsel that he wished to withdraw his complaint. It was not until Bar Counsel sent a letter to respondent two days later, on June 8, 2004, that he became aware that Mr. Saunders had filed a complaint against him.

Bar Counsel did not drop the case, as Mr. Saunders had requested. Instead, on July 27, 2005, Bar Counsel filed a Specification of Charges and Petition Instituting Formal Disciplinary Proceedings, which charged respondent with misappropriating client funds (Rule 1.15(a)); commingling his funds with client funds (Rule 1.15(a)); failing to maintain complete records of client funds (Rule 1.15(a) and D.C. Bar Rule XI § 19(f)); failing to treat an advance as client funds (Rule 1.15(d)); failing to take timely steps to surrender client funds (Rule 1.16(d)); and failing to deposit client funds in a specially-titled trust or escrow account (Rule 1.16(d)).[2]

The hearing committee found that Rule 1.15(d) did not apply to a flat fee because it is not an "advance" but the agreed-upon fee regardless of how much (or how little) legal work was required; and that, in any event, Mr. Saunders had agreed that the $7,500 belonged to respondent upon receipt.[3] However, the hearing committee concluded that respondent had commin-

---

1. There is a slight discrepancy as to when respondent's services were terminated. Respondent testified it was in early February, but Mr. Saunders testified that it was a month earlier.

2. Respondent is also a member of the Maryland State Bar. Bar Counsel amended the Specification of Charges to include, in the alternative, violations of the relevant Maryland Rules of Professional Conduct, which mirror the D.C. Rules. The Board endorsed the hearing committee's conclusion that the D.C. rules apply to this case. No party challenges the application of the D.C. rules.

3. Respondent's position was that "the fee was understood to be his property. . . . That a flat fee, as used frequently in the defense of street crime cases, does not fit neatly into the concept of 'unearned advance fee arrangement' as envisioned by Rule 1.15(d)." Mr. Saunders testified that "he also understood the fee to be the attorney's property." Bar Counsel argued that "the fee involved in this case is an advance of an unearned fee, and the fee remained Mr. Saunders's property upon transfer to Respondent, as no client consent was provided to a different arrangement."

gled funds, in violation of Rule 1.15(a) because "[r]espondent had placed a portion of the $7,500 in an escrow account containing client funds...."[4] But, the hearing committee found respondent "did not fail to take timely steps to surrender client funds," noting that he "acted honorably, and after some delay, refunded his entire fee even though he had spent some time advising [the client] and [Mr.] Saunders." The hearing committee recommended a public censure.

Except as to the hearing committee's conclusion that respondent did not fail to promptly return the fee, the Board, with one member dissenting, adopted the committee's findings and conclusions, including the interpretation that Rule 1.15(a) does not require lawyers to treat "flat fees" as client funds. The Board accordingly dismissed four of the six charges, including the most serious one, misappropriation, and found that respondent had commingled funds, in violation of Rule 1.15(a), and that he failed to promptly return the fee, in violation of Rule 1.16(d).[5] The Board agreed with the hearing committee's recommendation that respondent receive a public censure.

Before this court, Bar Counsel takes exception to the Board's interpretation of Rule 1.15(d) concerning advances on unearned fees, and to the Board's recommended sanction of public censure, arguing instead that respondent should be suspended for 60 days, with 30 days stayed in favor of one year of supervised probation.

Respondent agrees with the Board's interpretation of Rule 1.15(d) that a flat fee is not an advance on unearned fees. As to Rule 1.16(d), respondent argues that he "returned the fee as promptly as possible," and that "[t]here was no evidence of any purposeful intent to delay the return of the fee." He acknowledges that he commingled his fees in a client escrow account. Respondent does not take issue with the public censure recommended by the hearing committee and the Board, but argues that "suspension," as urged by Bar Counsel, "is not an appropriate sanction."

## II. Rule 1.15 and Flat Fees

Rule 1.15 provides:

(a) A lawyer shall hold property of clients or third persons that is in the lawyer's possession in connection with a representation separate from the lawyer's own property....

(d) Advances of unearned fees and unincurred costs shall be treated as property of the client pursuant to paragraph (a) until earned or incurred unless the client gives informed consent[6] to a different arrangement. Regardless of whether such consent is provided, Rule 1.16(d) applies to require the return to the client of any unearned portion of advanced legal fees and unincurred costs at the termination of the lawyer's services in accordance with Rule 1.16(d).[7]

---

**4.** Unusually, here the commingling involved the deposit of funds respondent believed belonged to him (i.e., the flat fee) in a client escrow account. The cases that have come before the court have involved the deposit of client funds in the attorney's operating account.

**5.** As noted, respondent did return the flat fee. The Board explained that "after agreeing to the return of the payment, Respondent failed to live up to his word and to his obligation under Rule 1.16(d) to take 'timely' steps to

return the 'property to which the client' was entitled."

**6.** Rule 1.15 (d) was amended in 2008 to refer to "informed consent" (rather than "consent"), consistent with the amendment to the terminology section of the rules. See note 10, *infra*.

**7.** Rule 1.16(d) provides:

In connection with any termination of representation, a lawyer shall take timely steps

■ We hold that when an attorney receives payment of a flat fee at the outset of a representation, the payment is an "advance[ ] of unearned fees" and "shall be treated as property of the client ... until earned unless the client consents to a different arrangement." Rule 1.15(d).

We begin our analysis by describing the nature of a flat fee. A flat fee is one that "embraces all work to be done, whether it be relatively simple and of short duration, or complex and protracted." *Iowa Sup.Ct. Bd. of Prof'l Ethics and Conduct v. Apland*, 577 N.W.2d 50, 55 (Iowa 1998) (quoting ABA Comm. on Ethics and Prof'l Responsibility, Informal Op. 1389 (1977)). A flat fee is different from an engagement retainer, which "is a fee paid, apart from any other compensation, to ensure that a lawyer will be available for the client if required." RESTATEMENT (THIRD) OF THE LAW GOVERNING LAWYERS § 34 cmt. e (2000); *see In re Sather*, 3 P.3d 403, 410 (Colo.2000) (en banc) ("In contrast to engagement retainers, a client may advance funds-often referred to as ... 'flat fees'-to pay for specific legal services to be performed by the attorney and to cover future costs.") (citations omitted); *see* D.C. Legal Ethics Op. 264 (February 14, 2006) (an engagement retainer is a nonrefundable payment to assure the availability of the attorney whether services are performed or not). Engagement retainers are earned when received, but it may become necessary to refund even a portion of a retainer if the lawyer withdraws or is discharged prematurely. *See* RESTATEMENT (THIRD) OF THE LAW GOVERNING LAWYERS § 38 cmt. g (2000) ("A fee payment that does not cover services already rendered and that is not otherwise identified is presumed to be a deposit against future services.").

■ The primary rule concerning the amount of fees is that "[a] lawyer's fee

shall be reasonable." Rule 1.5(a). We agree with the Colorado Supreme Court's holding in *Sather* that "an attorney earns fees only by conferring a benefit on or performing a legal service for the client." 3 P.3d at 410. "It simply makes no sense to permit lawyers to enter into fee agreements with clients stating that an advance payment such as a flat fee is earned upon receipt, when such payments are subject to being refunded to the extent unearned." Alec Rothrock, *The Forgotten Flat Fee; Whose Money is it and Where Should it be Deposited?*, 1 FLA. COASTAL L.J. 293, 347 (1999). Such a fee is earned "only to the degree that the attorney actually performs the agreed-upon services." *Id.* at 346. In sum, a flat fee is an advance of unearned fees because it is money paid up-front for legal services that are yet to be performed.

Here, the hearing committee found that that the $15,000 flat fee (with an additional $5,000 as required for third-party investigative services) was to compensate respondent for all the services that he would perform during the representation, from the inception of the case to its final disposition. Both Mr. Saunders and respondent testified that the first installment of $7,500 would cover respondent's efforts in assisting his client to turn himself in to the police, including contacting the government to find out about the charges against him, and possibly initiating discussions on a plea. Respondent was also expected to negotiate with the government over the terms of pretrial detention, as the client had said during an interview that he feared for his safety in jail as a result of his previous cooperation with the police in a drug case. Mr. Saunders promised to pay the second $7,500 after his son turned himself in, to compensate respondent for legal services to be rendered thereafter,

to the extent reasonably practicable to protect a client's interest, ... and refunding

any advance payment of fee or expense that has not been earned or incurred.

which could have included a trial. Thus, when Mr. Saunders terminated the representation before the first milestone was met (before the client turned himself in to the police), respondent was obligated to return the initial payment—or the portion that he had not earned—because a lawyer "cannot earn a fee for doing nothing." *In re Sather*, 3 P.3d at 414 (citing *Apland*, 577 N.W.2d at 57).

■ A corollary to the rule that a flat fee is an advance of unearned fees, is that the fee must be held as client funds in a client's trust or escrow account until they are earned by the lawyer's performance of legal services. *See* Rule 1.15(d). In accepting this consequence of our interpretation, we recognize that there are competing interests:

> If the funds are entrusted until earned, the attorney bears the inconvenience and, in some cases, genuine hardship of a delay in enjoying payment....
>
> If the funds are not entrusted until earned, the client suffers the risk that, if the funds are spent or attached by the lawyer's creditors, the client may obtain neither the agreed upon services nor the money in the form of a refund.

*Rothrock*, *supra* at 356 (quoting Lawrence A. Brickman, *Advance Fee Payment Dilemma: Should Payment be Deposited to the Client Trust Account or to the General Office Account?*, 10 Cardozo L.Rev. 647, 669 (1989)). Upon consideration of these competing interests, we conclude that the client's interest in protecting the funds override that of the lawyer's in immediate access to them, and that the public is ultimately better served by requiring that the lawyer keep flat fees in a trust or escrow account. As the Iowa Supreme Court aptly noted:

> This approach (1) preserves the client's property from the reach of the lawyer's creditors, (2) preserves the client's property from possible misappropriation by

the lawyer, and (3) enables the client to realistically dispute a fee where the funds are already in the lawyer's possession by disallowing a self help resolution by the lawyer and instead preserving the disputed funds intact until the dispute is resolved.

*Apland*, 577 N.W.2d at 56 (quoting Brickman, *supra* at 667).

■ Another important benefit to placing flat fees in a trust or escrow account is preservation of the client's right to choose his or her counsel, including the right to discharge an attorney. *See* D.C. Rule 1.7(b) cmt. 8 ("Clients have broad discretion to terminate their representation by a lawyer and that discretion may generally be exercised on unreasonable as well as reasonable grounds."). Since a flat fee is not owned by an attorney until it has been earned through the performance of services to the client, "the client will not risk forfeiting fees for work to be performed in the future if the client chooses to discharge his attorney." *In re Sather*, 3 P.3d at 410. With the flat fee protected, the client need not hesitate to exercise the right to discharge an attorney for fear that the attorney may keep the flat fee. *See id.* at 410 (citations omitted); *Rothrock*, *supra* at 359 ("[T]he client's absolute right to discharge the lawyer is impermissibly impaired if the lawyer cannot afford a refund and the client cannot afford to hire a new lawyer without one.").

■ Preserving the client's unfettered right to discharge an attorney protects the fiduciary relationship between lawyer and client. *See In re Cooperman*, 83 N.Y.2d 465, 611 N.Y.S.2d 465, 633 N.E.2d 1069, 1071 (1994) ("This unique fiduciary reliance, stemming from people hiring attorneys to exercise professional judgment on a client's behalf—'giving counsel'—is imbued with ultimate trust and confidence.") (citations omitted). A fee arrangement

that "substantially alter[s] and economically chill[s] the client's unbridled prerogative to walk away from the lawyer" strikes at the "core of the fiduciary relationship." *Id.* at 1072. "To answer that the client can technically still terminate misses the reality of the economic coercion that pervades such matters." *Id.*

In this case, for example, respondent's delay in returning the flat fee hindered Mr. Saunders from obtaining new counsel after he became dissatisfied with respondent's performance. Although Mr. Saunders was eventually able to obtain new counsel for his son before he received the refund, he had told respondent when he terminated him that he needed the money back to hire a new attorney. The record does not reveal, however, what arrangement Mr. Saunders had with new counsel, and whether the delay in receiving the refund from respondent had any bearing on their arrangement. But it is reasonable to assume that in most cases where criminal representation is required, it is imperative that counsel be secured, and working on the client's behalf, at the earliest possible time.

■ We do not intend by our holding to discourage attorneys from charging flat fees, as we recognize the benefits of a flat fee arrangement for both the client and the attorney. For the client, it "eliminate[s] the uncertainty, anxiety and surprise often found with hourly rates, especially in protracted litigation...."

Rothrock, *supra* at 354. For the lawyer, it "reward[s] efficiency and enable[s] the attorney to concentrate on the representation instead of fighting with the client over monthly bills[, and] provide[s] certainty of payment...." *Id.* We are not unaware that our holding could impose a financial hardship on solo practitioners and lawyers in smaller firms who rely on flat fees to maintain their practice.[8] But we also note that, consistent with the general requirement that a lawyer must entrust flat fees in a trust or escrow account until earned, the client may consent otherwise (if properly informed, as we discuss *infra* ), and the fee agreement may specify how and when the attorney is deemed to earn the flat fee or specified portions of the fee. *See* Rule 1.15(d); *cf.* Rothrock, *supra,* at 323 (Michigan rules allow the lawyer to withdraw fees according to milestones "based upon passage of time, the completion of certain tasks, or any other basis mutually agreed upon between the lawyer and client.") (citation omitted). Any such agreement, however, is subject to the overarching principle that an attorney's fees must be reasonable, and requires "return to the client of any unearned portion of advanced legal fees and unincurred costs." Rule 1.15(d); *see* Rule 1.16(d). Simply labeling a fee as something other than a flat fee[9] or extreme "front-loading" of payment milestones in the context of the anticipated length and complexity of the representa-

---

8. "Based upon a survey conducted in 2002, the ABA Commission on Billable Hours reports that fixed or flat fees are being used by 89% of solo practitioners, 63% of law firms with two to fifteen lawyers, and 54% of firms with sixteen to fifty lawyers." *In re Kendall,* 804 N.E.2d 1152, 1157 (Ind.2004) (citations omitted).

9. "While conceptually straightforward enough, the rule that lawyers must keep money in trust accounts when it is not their money becomes more complicated when applied to certain kinds of advance fee payments. The questionable ethical viability of non-refundable fee advance has inspired some imaginative terminology designed to characterize the advance payments in a manner that eludes the issue: retainers, non-refundable retainers, fee advances, or advanced fees, prepaid fees, *flat fees,* and minimum fees." *Apland,* 577 N.W.2d at 55 (quoting ABA/BNA *Lawyers' Manual on Professional Conduct* 45:109 (1993)).

tion will not excuse the lawyer from safe-keeping the client's funds until it can reasonably be said that they have been earned in light of the scope of the representation.

We note that although this is the first time we have expressly addressed the applicability of Rule 1.15 to flat fees, our holding today is consistent with *In re Hallmark*, 831 A.2d 366 (D.C.2003), where we sanctioned a lawyer for failing to return unearned portions of a flat fee. In *Hallmark*, the attorney charged a flat fee for performing two discrete tasks, and there was a dispute over what services the lawyer had performed. We held there that, "[e]ven assuming that [Hallmark] was entitled to withhold a portion of the [flat] fee in compensation for [completing one of the tasks,] this does not justify the withholding of the entire fee amount as it is clear that she performed only part of the work." *Id.* at 372.

Although not many jurisdictions have had occasion to decide the precise issue of how flat fees are to be treated, we note that our holding is consistent with the clear precept that prevails around the country with respect to advances of unearned fees, including in our immediate neighbors, Maryland and Virginia. *See In re Sather*, 3 P.3d at 412; *Attorney Grievance Comm. v. Zuckerman*, 386 Md. 341, 872 A.2d 693, 711 (2005) ("[F]unds given to an attorney in anticipation of future services qualify as 'trust money'. . . ."); *In re Carpenter*, 755 N.W.2d 749, 749 (Minn. 2008) (attorney transferred to inactive status after stipulating to various acts of misconduct including failure to deposit advance fees into a trust account); *State ex rel. Special Counsel for Discipline v. Fellman*, 267 Neb. 838, 678 N.W.2d 491, 496–97 (2004) (finding that "[t]he record in this case reveals no basis to find that the $1,100 was an engagement retainer belonging to [the attorney] upon receipt");

*In re Dawson*, 129 N.M. 369, 8 P.3d 856, 859 (2000) (holding that "a lawyer's claim that he or she charged a client a flat fee or retainer that is not refundable will not suffice to justify a failure to deposit unearned client funds in a trust account, a withdrawal of client funds from a trust account to pay fees that have not been earned, or a failure to promptly return unearned funds to a client upon termination"); *Marcus Santoro & Kozak, P.C. v. Wu*, 274 Va. 743, 652 S.E.2d 777, 781 (2007) ("An attorney who receives funds from a client for the future payment of legal fees for services not yet rendered holds those funds in trust."); *In re Blanchard*, 158 Wash.2d 317, 144 P.3d 286, 295 (2006) (attorney suspended for acts of misconduct, including failure to deposit advance fees into a trust account); *In re Gedlen*, 305 Wis.2d 34, 739 N.W.2d 274, 275–76 (2007) (attorney's license revoked for numerous acts of misconduct including failure to deposit advance fees in a trust account); *see also* Rule Regulating the Fla. Bar 5–1.1(b) ("Money or other property entrusted to an attorney for a specific purpose, including advances for fees, costs, and expenses, is held in trust and must be applied only to that purpose."); S.C. Rule of Prof'l Responsibility 1.15(c) ("A lawyer shall deposit into a client trust account unearned legal fees and expenses that have been paid in advance . . . ."); *cf. Smith v. Binder*, 20 Mass.App.Ct. 21, 477 N.E.2d 606, 608 (1985) (voiding nonrefundable retainer for public policy reasons); *In re Cooperman*, 611 N.Y.S.2d 465, 633 N.E.2d at 1072 ("[W]e hold that the use of a special nonrefundable retainer fee agreement clashes with public policy because it inappropriately compromises the right to sever the fiduciary services relationship with the lawyer.").

However, since we announce for the first time that under Rule 1.15(d) flat fees are an advance of unearned fees that belong to

the client until earned by the lawyer (unless other reasonable arrangements have been made), we agree with the recommendation made by both the Board and Bar Counsel that our holding in this case should be prospective only. *See In re Sather,* 3 P.3d at 412 n. 11 (noting that "we are aware that many attorneys believe that they are adhering to the rules of professional conduct when they treat flat fees and other forms of advance fees as their own property, and we acknowledge that our holding today forecloses this widely-used practice. For these reasons, we make our holding prospective."). The rule's application to flat fees is not clear on its face and, as not only respondent but his expert testified, the understanding among lawyers with respondent's type of practice has been that flat fees belong to the lawyer upon receipt, and therefore need not be kept separately in a trust account. We are confident that the D.C. Bar Board of Governors, the Bar's relevant sections, and the Board and Bar Counsel will take steps to inform the Bar and provide attorneys with helpful guidance on how to conform their practice to the rule we announce in this opinion. Our purpose is not to discipline attorneys for inadvertent violations based on reasonable, but mistaken interpretations of the rules, but to make lawyers' obligations clear so that the interest of the public will be protected. *Cf. In re Haar,* 698 A.2d 412, 424 (D.C.1997) (mitigating sanction for negligent misappropriation because respondent believed "in good faith, although negligently, that he had an undisputed right" to withdraw money from the trust account to pay for his legal services).

### III. Informed Consent

 Although the default rule is that an attorney must hold flat fees in a client trust or escrow account until earned, we note that an attorney may obtain informed consent from the client to deposit all of the money in the lawyer's operating account or to deposit some of the money in the lawyer's operating account as it is earned, per their agreement. *See* Rule 1.15(d); *see also In re Sather,* 3 P.3d at 413–14. "Informed consent denotes the agreement by a person to a proposed course of conduct after the lawyer has communicated adequate information and explanation about the material risks of and reasonably available alternatives to the proposed course of conduct." D.C. Bar Rules—Terminology (2009).[10] In order to ensure knowing client consent to a different arrangement concerning the treatment of flat fees, the Colorado Supreme Court has noted that

> the attorney must expressly communicate to the client verbally and in writing that the attorney will treat the advance fee as the attorney's property upon receipt; that the client must understand the attorney can keep the fee only by providing a benefit or providing a service for which the client has contracted; that the fee agreement must spell out the terms of the benefit to be conferred upon the client; and that the client must be aware of the attorney's obligation to refund any amount of advance funds to the extent that they are unreasonable or

10. As noted, when the conduct at issue in this case took place, Rule 1.15(d) referred to "consent" (rather than "informed consent"), see note 6, *supra.* "Consent" was defined as "a client's uncoerced assent to a proposed course of action following consultation with the lawyer regarding the matter in question." D.C. Bar Rules—Terminology (2004). "Consultation" required "communication of information reasonably sufficient to permit the client to appreciate the significance of the matter in question." *Id.* In 2008, the definitions of "consent" and "communication" were merged into the current definition of "informed consent" quoted in the text. We perceive no substantial difference between the two definitions for purposes of this case.

unearned if the representation is terminated by the client.

*In re Sather,* 3 P.3d at 413. We agree, and add that the client should be informed that, unless there is agreement otherwise, the attorney must, under Rule 1.15(d), hold the flat fee in escrow until it is earned by the lawyer's provision of legal services.

Here, for example, if we assume our holding today applied to respondent, we would have to conclude that neither Mr. Saunders nor his son (the client) gave respondent the informed consent required to waive the requirements of Rule 1.15(d). Respondent admitted that he did not discuss the fee arrangement in detail with Mr. Saunders, and did not mention the option to deposit the advance payment in an escrow account.[11] This was consistent with respondent's understanding that he had no obligation to do so. But, as a matter of fact, respondent did not communicate what a client would have needed to know to give informed consent. According to Mr. Saunders, respondent did not discuss with him how the initial payment of the flat fee was to be treated:

> [Attorney:] Did [respondent] discuss with you his belief that the $7500 was his money as soon as you gave it to him?
>
> [Mr. Saunders:] We didn't discuss that. I just figured that that was a lawyer's fee. So I didn't ask. I just figured that was the standard fee. That's what you paid for his service.
>
> . . . .
>
> [Attorney:] Do you know what an escrow account is?
>
> [Mr. Saunders:] I've got a faint idea what it is.
>
> [Attorney:] Did [respondent] discuss with you whether the money that you

gave him would go into an escrow account or otherwise?

> [Mr. Saunders:] That never came up in our conversation.

▇▇▇▇ In view of this testimony, we cannot agree with the Board's finding that "Mr. Saunders consented to an arrangement whereby the funds could be treated as the property of the attorney...." At a minimum, a lawyer must explain to the client "the basis for this arrangement and explain[ed] how [the client's] rights are protected by the arrangement." *In re Sather,* 3 P.3d at 414. Where there is no discussion regarding the fee arrangement besides merely stating the overall fee, and no mention of the escrow account option, a client cannot be said to have a sufficient basis to give informed consent to waive the requirements of a rule designed to protect the client's interests.

## IV. Sanction

▇▇▇▇ "So long as the Board's sanction recommendation falls within the wide range of acceptable outcomes, it comes to us with a strong presumption in favor of its imposition...." *In re Bingham,* 881 A.2d 619, 623 (D.C.2005). But "[i]n deciding whether to adopt the Board's recommendation, we must examine the 'nature of the violation, aggravating and mitigating circumstances, the absence or presence of our prior disciplinary sanctions, the moral fitness of the attorney, and the need to protect the legal profession, the courts, and the public.'" *Id.* (quoting *In re McLain,* 671 A.2d 951, 954 (D.C.1996)). "We also consider the number of clients prejudiced by an attorney's misconduct; the degree of vulnerability of the client prejudiced and the experience level of the attorney; and the time span of the miscon-

---

**11.** There was a written, but cursory, "agreement" that acknowledged respondent's receipt of the $7,500.

duct; together with the Report and Recommendation of the [Board]." *In re Elgin*, 918 A.2d 362, 376 (D.C.2007) (citations omitted).

 In light of the foregoing analysis of the applicability of Rule 1.15 to flat fees, respondent's actions would constitute misappropriation of client funds in violation of Rule 1.15(a); commingling of lawyer funds with those of the client in violation of Rule 1.15(a); failure to maintain complete records of client funds in violation of Rule 1.15(a) and D.C. Bar Rule XI § 19(f); failure to treat an advance as client funds in violation of Rule 1.15(d); failure to take timely steps to surrender client funds in violation of Rule 1.16(d); and failure to deposit client funds in a specially titled trust or escrow account, in violation of Rule 1.16(d). But because we have decided to apply our interpretation of Rule 1.15(d) prospectively, except for commingling and for failure to promptly return funds once respondent was terminated, respondent cannot be deemed to have committed the more serious violations of those provisions. *See Apland*, 577 N.W.2d at 56 (noting that the violations were "not intentional given the uncertainty at the time about whether such fees were subject to trust account requirements"). Therefore, the issue is what is the appropriate sanction for commingling (by depositing most of the flat fee respondent mistakenly, but in good faith, thought belonged to him in a client escrow account), and for failing to promptly return funds to the client once respondent agreed to do so.

We consider mitigating as well as aggravating factors. There are several factors that favor mitigation. Respondent fully cooperated with Bar Counsel during the proceeding. The hearing committee commented that it was "impressed with the seriousness with which [respondent] appeared to take these proceedings." As we have previously recognized, respondent has a "lengthy and well-reputed history of providing an important service" to the community by serving as one of the few members of the bar engaged in the practice of street crime defense. *In re Mance*, 869 A.2d 339, 342 n. 10 (D.C.2005). Any suspension has a greater impact on a solo practitioner, or a lawyer in a very small firm, than on a lawyer who is part of a larger practice where other attorneys can more easily step in during the period of suspension.

There are some aggravating factors. Respondent has a history of prior discipline: in 1996 and 2000, Bar Counsel informally admonished respondent for failing to provide a written retainer agreement as required by Rule 1.15(b); and in 2005, the court imposed a 30–day suspension on respondent, stayed in lieu of a one-year probation, for failing to protect his client's appeal rights in a criminal case. *See id.* We agree with the Board, however, that respondent's prior misdeeds, while not to be dismissed, do not implicate his moral character or integrity.

We also take into account that Mr. Saunders and his son were, to a degree, prejudiced by respondent's failure to promptly return the money. Mr. Saunders had told respondent that he needed the money to hire a new attorney. Mr. Saunders was, however, able to hire replacement counsel before he received the refund, and, once he did receive it, he withdrew his complaint and asked Bar Counsel to drop the disciplinary proceeding. Respondent also placed Mr. Saunders's money in jeopardy by commingling funds during a time when he was embroiled in a tax dispute with the D.C. government. But respondent did not, as the Board found, act dishonestly or attempt to misappropriate client funds.

In view of all these circumstances—which the Board considered in its report—

we adopt the Board's recommended sanction of public censure, which is consistent with discipline imposed in similar cases.[12] *See, e.g., In re Mitchell,* 727 A.2d 308, 314 n. 7, 315 (D.C.1999) (imposing public censure for various acts of misconduct, including violation of Rule 1.16(d)); *In re Goldberg,* 721 A.2d 627, 628 (D.C.1998) (per curiam) (imposing public censure for comingling); *In re Teitelbaum,* 686 A.2d 1037, 1039 (D.C.1996) (per curiam) (same); *In re Ingram,* 584 A.2d 602, 603–04 (D.C. 1991) (per curiam) (public censure for commingling, failing to inform client of settlement, and failing to promptly deliver funds upon client's request).

Accordingly, Robert W. Mance, III, is hereby publicly censured.

*So ordered.*

12. We note that the Board's dissenting member, who disagreed with the Board's interpretation of Rule 1.15(d) as applied to flat fees, as do we, also recommended that the new interpretation be applied prospectively and that respondent should receive a public censure.