*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 23-BG-0591

IN RE MICHAEL ALEXEI, RESPONDENT.

A Member of the Bar of the
District of Columbia Court of Appeals
(Bar Registration No. 999055)

On Report and Recommendation of the
Board on Professional Responsibility

(Disciplinary Docket No. 2016-D375)
(Board Docket No. 20-BD-018)

(Argued May 14, 2024                    Decided August 1, 2024)

*Theodore (Jack) Metzler*, Senior Assistant Disciplinary Counsel, with whom *Hamilton P. Fox, III*, Disciplinary Counsel, *Julia L. Porter*, Deputy Disciplinary Counsel, and *Caroll Donarye*, Assistant Disciplinary Counsel, were on the brief, for petitioner.

*Kristin Paulding* for respondent.

Before BLACKBURNE-RIGSBY, *Chief Judge*, and EASTERLY and SHANKER, *Associate Judges*.

SHANKER, *Associate Judge*: The Office of Disciplinary Counsel for the District of Columbia alleges that attorney Michael Alexei violated D.C. Rule of Professional Conduct 1.15(a), regarding safekeeping of client property, by

withdrawing funds paid by a client as an advance on a flat fee before he had completed the services for which he had been hired. Both the Ad Hoc Hearing Committee and the D.C. Board on Professional Responsibility concluded that Mr. Alexei violated no rules of professional conduct because he had earned at least a portion of the advance payment as he worked on the case.

We hold that—absent an agreement specifying to the contrary—an attorney earns a flat-fee payment only upon completion of all the enlisted services. Because, however, we announce this interpretation of Rule 1.15 for the first time, we embrace the Board's recommendation to apply the holding prospectively. We therefore conclude that Mr. Alexei did not violate Rule 1.15(a), even though the same conduct might violate the rule if it occurs after the issuance of this opinion.

## I.  Background

The Board found the following facts. Maria Victoria Dijamco hired Mr. Alexei to assist her with certain immigration needs. They agreed in writing that Mr. Alexei would file, on Ms. Dijamco's behalf: (1) a green card application in exchange for a fee of $1,500; (2) a humanitarian reinstatement request in exchange for $750; and (3) an appeal from a prior immigration decision in exchange for $2,750. The price totaled $5,000, and, in accordance with the agreement, Ms. Dijamco paid $2,500 upfront, with the remainder due once Mr. Alexei filed the

documents.  Mr. Alexei deposited the advance into his firm's trust account.  The agreement neither mentioned Mr. Alexei's hourly rate nor specified how Mr. Alexei might earn the advanced funds.

Five days after Ms. Dijamco paid the initial deposit, Mr. Alexei withdrew $1,900 from the trust account, leaving $2,010.98 in the account—$489.02 less than Ms. Dijamco's deposit.  By this point, the Mr. Alexei had already performed six to eight hours of work on Ms. Dijamco's case, which, at Mr. Alexei's standard hourly rate of $250 to $350 an hour, the Hearing Committee found exceeded the amount of Ms. Dijamco's funds he had withdrawn from the trust account.  Mr. Alexei later withdrew more funds from the trust account, leaving the total funds in the account at $738.98—$1,761.02 below Ms. Dijamco's deposit.  As before, the Hearing Committee found $1,761.02 to be less than the amount Mr. Alexei had earned by working on the case based on his hourly rate.  Ms. Dijamco and Mr. Alexei eventually added an addendum to their agreement, but the overall fee remained the same.

Roughly nine months after the initial agreement, Ms. Dijamco paid the remaining $2,500.  Mr. Alexei deposited the money directly into his personal account. The Hearing Committee found that, at this point, Mr. Alexei had completed all the work required of him by the agreement despite having not filed the forms yet.

Ms. Dijamco's green card application was ultimately denied, and she hired new counsel.  She then brought a disciplinary complaint against Mr. Alexei.  Just before submitting the complaint, Ms. Dijamco reached out to Mr. Alexei to explain the complaint.  She wrote:

> I wanted to thank you for all of your help with my appeal, as you know I have chosen other representation in Chicago that will hopefully help with the application process.  I also wanted to let you know that you may receive a claim/grievance letter from my new attorney.  Please understand this is not personal, it is just something that is necessary in order to re-open my case.  I hope you understand, and I sincerely thank you again for all of your help.

After receiving Ms. Dijamco's complaint—which did not reference the misappropriation of any funds—Disciplinary Counsel investigated Mr. Alexei.  Disciplinary Counsel charged Mr. Alexei with violating a number of professional conduct rules relating to his duty of competence, skill, and care; charging an unreasonable fee; making false statements to Disciplinary Counsel; and, as relevant here, misappropriating client funds.

The Ad Hoc Hearing Committee reviewed Disciplinary Counsel's evidence and found that Disciplinary Counsel had "failed to prove any of the charged violations by clear and convincing evidence," and it "recommend[ed] that the charged violations be dismissed."  As relevant here, the Committee found that Mr. Alexei had "earned the fees he took at the time of each payment."

Reviewing the Committee's decision, the Board also concluded that "Disciplinary Counsel failed to prove by clear and convincing evidence that [Mr. Alexei] engaged in reckless or intentional misappropriation, in violation of Rule 1.15(a)," and dismissed all the charges. After discussing this court's decision in *In re Mance*, 980 A.2d 1196, 1203 (D.C. 2009), the Board determined that that case did not "articulate the bright-line rule that Disciplinary Counsel now advocates." Disciplinary Counsel had argued that *In re Mance* held that advanced payments on a flat fee could be earned only after the attorney finished the legal services encompassed by the fee. The Board disagreed. It explained that "the issue is whether Disciplinary Counsel proved by clear and convincing evidence that [Mr. Alexei] withdrew more of the flat fee than he had reasonably earned [at that point] in light of the scope of the representation." The Board ultimately "agree[d] with the Hearing Committee that Disciplinary Counsel failed to carry its burden." In the alternative, the Board suggested that if this court were to agree with Disciplinary Counsel about *In re Mance*, we should apply that understanding "prospectively." It emphasized that D.C. Bar Ethics Opinion 355—which had been withdrawn on other grounds—had advised, even after *In re Mance*, that attorneys could withdraw earned portions of flat fees without the client's consent.

Disciplinary Counsel appeals only the Board's decision that Disciplinary Counsel failed to prove by clear and convincing evidence that Mr. Alexei engaged in reckless or intentional misappropriation in violation of Rule 1.15(a).

## II. Discussion

This case requires the court to determine when an attorney earns advanced fees within the meaning of D.C. Rule of Pro. Conduct 1.15(e). That rule specifies that

> [a]dvances of unearned fees and unincurred costs shall be treated as property of the client pursuant to paragraph (a) until earned or incurred unless the client gives informed consent to a different arrangement. Regardless of whether such consent is provided, Rule 1.16(d) applies to require the return to the client of any unearned portion of advanced legal fees and unincurred costs at the termination of the lawyer's services in accordance with Rule 1.16(d).

*Id.* Because unearned fees constitute property of the client, if an attorney removes the unearned fees from their trust account, the attorney may violate Rule 1.15(a). *See In re Abbey*, 169 A.3d 865, 872 (D.C. 2017). In *In re Mance*, we held that money advanced on a flat-fee payment constitutes unearned fees within the meaning of Rule 1.15(e) "until [it is] earned by the lawyer's performance of legal services." 980 A.2d 1196, 1203 (D.C. 2009). Thus, if Mr. Alexei had not yet provided the legal

services necessary to earn the $2,500 advance payment when he withdrew portions of the funds, he misappropriated Ms. Dijamco's money.

The parties dispute precisely how attorneys earn fees through the provision of legal services within the meaning of Rule 1.15. Disciplinary Counsel contends that attorneys may earn advances on a flat fee only after they complete the entirety of the assigned task. Mr. Alexei, on the other hand, argues that attorneys may earn portions of the advance throughout the representation as they work toward their clients' legal needs. In particular, he seems to argue that attorneys may earn the advanced fee at their hourly rate as they perform work. The Board agreed with Mr. Alexei. We review de novo the Board's legal conclusion about what it means to earn funds under Rule 1.15. *In re Dobbie*, 305 A.3d 780, 792 (D.C. 2023).

We hold that attorneys earn fees advanced on a flat-fee arrangement only upon completion of the entirety of the solicited services—unless the fee agreement specifies otherwise. We first address *In re Mance* and determine that it does not answer the question at hand. Next, we explain why other considerations favor treating advanced fees as earned only after all the enlisted legal services have been provided. Finally, we explain why we decide to apply this rule prospectively such that Mr. Alexei is not sanctioned.

## A. *In re Mance* Does Not Resolve this Case

Both parties assert that *In re Mance* directly or indirectly mandates their preferred result in this case. We read *In re Mance* differently. As discussed above, this court held in *In re Mance* that an advance payment on a flat fee remains client money "until it is earned." 980 A.2d at 1199. The question here is whether Mr. Alexei had earned at least a portion of the advanced money before he withdrew it.

Neither the facts nor the holding of *In re Mance* offer much guidance in answering that question. There, attorney Robert Mance immediately placed a portion of an advanced fee into his own operating account, as opposed to his client escrow account. *Id.* at 1200. Because he did so immediately, there was no time for him to have earned the money through his provision of legal services—partial or otherwise. In holding that this constituted misappropriation, we rejected the view that advance payments on flat fees are earned "upon receipt." *Id.* at 1199. Instead, we said, the advance payment must be "earned by the lawyer's performance of legal services" before the attorney may transfer funds into their personal or operating account. *Id.* at 1203. We did not, however, take the further step of explaining whether the "performance of legal services" means the complete or partial

performance of those services. The facts and holding of *In re Mance*, therefore, cohere with both parties' interpretations of Rule 1.15(e).

Undeterred, both Mr. Alexei and Disciplinary Counsel glean support for their interpretations from various phrases and references in the opinion. Disciplinary Counsel, for its part, points to language in *In re Mance* that it views as implying that we intended "earn" to refer to completing the enlisted legal service. For example, Disciplinary Counsel quotes language from the opinion that a flat fee "is earned 'only to the degree that the attorney actually performs the agreed-upon services.'" *Id.* at 1202 (quoting Alec Rothrock, *The Forgotten Flat Fee: Whose Money Is It and Where Should It Be Deposited?*, 1 Fla. Coastal L.J. 293, 346 (1999)). Similarly, Disciplinary Counsel references language stating that fees "are earned by the lawyer's performance of legal services" and "a flat fee is not owned by an attorney until it has been earned through the performance of services to the client." *Id.* at 1203.

This language may be consistent with Disciplinary Counsel's interpretation of *In re Mance*, but it is not inconsistent with Mr. Alexei's alternative interpretation. Performance of a legal service could mean the continuous performance of legal services or the discrete (and complete) performance of a legal service. Notably, *In re Mance* never refers to completing legal services or some other term that would

foreclose Mr. Alexei's interpretation—unlike courts in other jurisdictions, which have expressly adopted Disciplinary Counsel's approach. *See, e.g., Iowa Sup. Ct. Att'y Disciplinary Bd. v. Piazza*, 756 N.W.2d 690, 698 (2008) (per curiam) ("[A] flat fee is an advance fee that is earned when the services are *completed* and therefore requires deposit in a client trust account . . . ."). Apparently reaching the same conclusion, the Board catalogued the relevant passages from *In re Mance* about performing legal services and concluded that "*Mance* speaks in somewhat flexible terms regarding when an attorney earns fees."

Disciplinary Counsel's best evidence with respect to *In re Mance* is a passage contrasting the default rule it established with alternative arrangements attorneys could create with their clients. The court explained that

> [a]lthough the default rule is that an attorney must hold flat fees in a client trust or escrow account until earned, we note that an attorney may obtain informed consent from the client to deposit all of the money in the lawyer's operating account or *to deposit some of the money in the lawyer's operating account as it is earned*, per their agreement.

*In re Mance*, 980 A.2d at 1206 (emphasis added). By contrasting "deposit[ing] some of the money in the lawyer's operating account as it is earned"—which Disciplinary Counsel takes to be essentially Mr. Alexei's interpretation of the rule—with the default rule it was creating, Disciplinary Counsel argues that Mr. Alexei's interpretation cannot be *In re Mance*'s default rule.

We think this too slender a reed to support Disciplinary Counsel's interpretation. First, it is not a direct statement of the court's holding but rather a hypothetical that, by implication, sheds some light on the default rule the court created.

Second, the surrounding discussion casts some doubt on Disciplinary Counsel's interpretation. Just after the aforementioned quote, the court quoted from *In re Sather*, 3 P.3d 403 (Colo. 2000), *modified on denial of reh'g* (June 12, 2000), and "agree[d]" with its explanation of the requirements for informed consent to create an alternative arrangement. *In re Mance*, 980 A.2d at 1206-07. And, earlier in the opinion, the court "agree[d] with" *In re Sather*'s holding "that 'an attorney earns fees only by conferring a benefit on or performing a legal service for the client.'" *Id.* at 1202 (quoting *In re Sather*, 3 P.3d at 410). The Colorado Supreme Court, however, appears to have endorsed Mr. Alexei's interpretation of when an attorney can earn an advanced flat fee. *See In re Sather*, 3 P.3d at 411 ("Attorneys often deduct costs from advance payments as they incur the costs, similar to the manner in which they deduct their fees as they are earned."). If the *In re Mance* court envisioned a different default rule, it did not clearly say so.[1]

---

[1] As Disciplinary Counsel points out, a different Colorado rule requires that "[i]f any portion of the flat fee is to be earned by the lawyer before conclusion of the

Third, by using the phrase "as it is earned," *In re Mance*, 980 A.2d at 1206,
the court arguably embraced Mr. Alexei's interpretation that fees can be earned
continuously.  Granted, the phrase comes in the court's discussion of alternative
arrangements that a client might consent to, but client consent does not alter the
fundamental nature of when a fee is earned.  Instead, it merely permits an attorney
to *treat* unearned client fees—which remain unearned fees—as their own property.
*See* D.C. Rule of Pro. Conduct 1.15(e) ("Advances of unearned fees . . . shall be
treated as property of the client pursuant to paragraph (a) until earned or incurred
unless the client gives informed consent to a different arrangement."); *In re Sather*,
3 P.3d at 412 ("For other forms of advance fees, the attorney may transfer the funds
to the attorney's personal or operating accounts only after earning the fees unless,
within a very limited set of circumstances, the attorney and client have agreed in
writing to allow the attorney *to treat the unearned fees as property of the attorney*."
(emphasis added)).  After all, if client consent could change when an attorney earned
fees, it would not be true that "a lawyer 'cannot earn a fee for doing nothing,'" *In re*

---

representation," the agreement must specify "the amount to be earned upon the
completion of specified tasks or the occurrence of specified events."  Colo. R. Pro.
Conduct 1.5(h)(1)(iii).  The addition of Subsection h, however, post-dated *In re
Sather*.  *Compare* Colo. R. Pro. Conduct 1.5(f) (2018) (excluding the relevant
subsection and stating only that "[a]dvances of unearned fees are the property of the
client and shall be deposited in the lawyer's trust account pursuant to
Rule 1.15B(a)(1) until earned")), with Colo. R. Pro. Conduct 1.5(h)(1)(iii) (2019)
(including the aforementioned language).

*Mance*, 980 A.2d at 1203 (quoting *In re Sather*, 3 P.3d at 414), because a client could consent to an arrangement whereby the lawyer earned the fees upfront. *See id.* at 1206 (suggesting that a client could consent to an attorney "deposit[ing] all of the money in the [attorney's] account"). Moreover, if consent could make unearned fees earned, the second half of Rule 1.15(e) would make little sense. That portion of the rule provides that "[r]egardless of whether [informed] consent is provided, Rule 1.16(d) applies to require the return to the client of any unearned portion of advanced legal fees and unincurred costs." D.C. R. Pro. Conduct 1.15(e). The rule thus contemplates that the fees remain unearned despite informed client consent. That would not make sense if the fees had been earned by virtue of the client consent. In light of these considerations, we do not interpret *In re Mance* as having held that fees are earned only upon the completion of legal services.

That does not mean, however, that *In re Mance* endorsed Mr. Alexei's interpretation either. Rather, the best reading of *In re Mance* is that it did not take a stance on the issue of whether advances on flat fees may be earned continuously or only upon completion of the legal services. Indeed, the *In re Mance* court had no occasion to answer that question because Mr. Mance placed the funds in his personal account immediately. *In re Mance*, 980 A.2d at 1200.

Mr. Alexei resists this conclusion because *In re Mance* cited to some authority consistent with his position. He points in particular to *In re Sather* and *In re Hallmark*, 831 A.2d 366 (D.C. 2003). Although *In re Mance* discussed *In re Sather* with approval, the inference that it therefore incorporated Colorado's definition of what it means to earn funds by performing legal services, without saying a word on the matter, is at least as tenuous as Disciplinary Counsel's inference discussed above. As for *In re Hallmark*, the *In re Mance* court explained that its holding was "consistent with" that case. 980 A.2d at 1205. But *In re Hallmark* did not embrace Mr. Alexei's view. It said only: "Even assuming that [Ms. Hallmark] was entitled to withhold a portion of the retainer fee in compensation for appearing before the court, this does not justify the withholding of the entire fee amount as it is clear that she performed only part of the work." *In re Hallmark*, 831 A.2d at 372. The court in *In re Hallmark* only assumed the possibility of Mr. Alexei's position; it did not endorse it. Therefore, *In re Mance*'s acknowledgment that its holding aligns with *In re Hallmark* does not advance Mr. Alexei's position.

## B.     Flat Fees Are Earned Upon Completion

Having concluded that *In re Mance* does not answer the question at hand, we now address the proper interpretation of Rule 1.15 as a matter of first impression. We hold that, as a default rule, attorneys earn funds advanced on a flat-fee payment

only when all the legal services pertaining to the flat fee are complete. We reach this conclusion for three reasons: (1) it best fits the nature of a flat fee, (2) it places the onus to contract differently on the party generally best positioned to do so, and (3) it facilitates clarity and better enforcement of the rules of professional conduct.

First, treating flat fees as earned upon completion of all the legal services coheres with the nature of a flat fee. Flat fees "embrace[ ] all work to be done, whether it be relatively simple and of short duration, or complex and protracted." *In re Mance*, 980 A.2d at 1202 (quoting *Iowa Sup. Ct. Bd. of Pro. Ethics & Conduct v. Apland*, 577 N.W.2d 50, 55 (Iowa 1998)). Flat fees benefit clients by "eliminat[ing] the uncertainty, anxiety and surprise often found with hourly rates, especially in protracted litigation"; and, for the attorney, they "reward[ ] efficiency and enable[ ] the attorney to concentrate on the representation instead of fighting with the client over" billing. *Id.* at 1204 (quoting Alec Rothrock, *The Forgotten Flat Fee: Whose Money Is It and Where Should It Be Deposited?*, 1 Fla. Costal L.J. 293, 354 (1999) (footnote omitted)). At the point where both attorney and client have chosen to eschew an hourly fee in favor of a flat fee, it would be odd—as a default rule—to import an hourly fee into the arrangement as Mr. Alexei proposes.

Second, setting the default rule so that advance fees remain client funds until the legal services are all completed creates positive incentives for attorneys and

clients to contract for their preferred arrangement. This default rule favors clients because the funds remain theirs for a longer period. *See In re Mance*, 980 A.2d at 1203 ("Since a flat fee is not owned by an attorney until it has been earned through the performance of services to the client, 'the client will not risk forfeiting fees for work to be performed in the future if the client chooses to discharge his attorney.' With the flat fee protected, the client need not hesitate to exercise the right to discharge an attorney for fear that the attorney may keep the flat fee." (citation omitted) (quoting *In re Sather*, 3 P.3d at 410)). Creating a default rule that favors clients incentivizes attorneys to negotiate, and include in their contracts, the specific terms that they seek in contrast to that default rule. Placing the onus to contract around this default rule on attorneys facilitates better contracting because attorneys—by virtue of both their profession and the frequency with which they contract for legal services—will typically be more aware of the default rule and better able to draft contracts around them. *See* Ian Ayres & Robert Gertner, *Filling in Incomplete Contracts: An Economic Theory of Default Rules*, 99 Yale L.J. 87, 98-99 (1989) (arguing that when "it is reasonable to expect one party to the contract to be systematically informed about the default rule and the probability of the relevant contingency arising," courts should set the default rule against that party's interests). This default rule thus encourages attorneys to set forth in their contracts

their preferred advanced-fee allocation, which in turn apprises the client of the allocation, likely resulting in a better contract for both parties. *See id.* at 99-100.

Third, the default rule that attorneys earn money advanced on a flat fee after completing all the enlisted legal services promotes clarity and facilitates better enforcement of Rule 1.15. Under the default rule, the money remains unearned until the attorney completes all the bargained-for tasks. Although there may be some complicated cases, we anticipate that in most situations determining whether an attorney has completed the legal services will prove simple. If the parties stipulate to an alternative arrangement, the terms of that arrangement will be spelled out in the agreement, and the division of client versus attorney money will be as clear as the contract.

Adopting Mr. Alexei's position, however, would lead to the difficult process of measuring exactly what portion of a fee the attorney had earned. Mr. Alexei appears to defend a rule whereby the attorney earns increments of the advanced fee at their hourly rate as they work. Imagine, however, a situation where the client pays the entire fee as an advance. An attorney in such a situation might "earn" the entire flat fee before coming close to completing the bartered-for services if their hourly rate is high. Is it fair to say that an attorney has earned the entire flat fee when they are not close to completing the task? In the opposite direction, a particularly efficient

lawyer might have all but completed a legal service yet have "earned" only a small fraction of the fee. The use of attorney billable hours as a proxy for how much of a flat fee an attorney has earned is particularly striking when considering that the parties have, by virtue of choosing a flat fee, explicitly decided to eschew the billable-hour model. Indeed, as is the case here, the agreement might not even specify the attorney's billable rate, and the attorney might not have kept detailed records of the hours they worked—as they might have under a typical billable-hour arrangement. This would leave the client entirely unaware of which funds remained theirs and which funds had become attorney property. Perhaps we could measure how much of a fee an attorney has earned based on the percent of the work completed. As attorneys well know, however, predicting how much legal work remains to be finished—and thus what percent has already been completed—often proves difficult. Under either regime, both attorneys and Disciplinary Counsel would be left with substantial uncertainty about which fees were earned versus unearned. How could either party know whether an attorney had yet earned a certain percentage of the advanced money?

This uncertainty about which funds are earned versus unearned would, moreover, pose a significant risk to attorneys. An attorney might claim to have worked a certain amount of hours or have completed a certain percentage of the work, but they would not be able to anticipate whether the Hearing Committee and

Board would agree. If the Board and Committee disagreed with the attorney's ad hoc determination about what portion of an advanced fee they had earned, the attorney might be subject to disbarment for intentionally or recklessly misappropriating client funds. *See In re Addams*, 579 A.2d 190, 191 (D.C. 1990) (en banc) ("We now reaffirm that in virtually all cases of misappropriation, disbarment will be the only appropriate sanction unless it appears that the misconduct resulted from nothing more than simple negligence."); *see also In re Gray*, 224 A.3d 1222, 1233 (D.C. 2020) (per curiam) (rejecting an attorney's good-faith defense and disbarring him for reckless misappropriation of client funds). Similarly, if a client terminates their attorney part-way through the representation, the attorney would need to determine exactly how much of the advanced fee they had earned at that point in order to return the unearned portion. They would make that determination unguided by a clear rule or contract and on pain of potential disbarment. Even if the Hearing Committee and Board believed that the misappropriation was merely negligent, the attorney still risks suspension and a mark on their bar disciplinary record. *See In re Zamora*, 310 A.3d 1074, 1081-82 (D.C. 2024) (suspending an attorney for eight months for negligently misappropriating client funds and failing to hold client advance fees in a trust account because the attorney failed to adequately obtain informed client consent per *In re Mance*). Rather than pick between these unsatisfying options, we prefer to create a clear

default rule and leave it for attorneys and their clients to specify alternative arrangements in their contracts for how to distribute the ownership of advanced funds as they see fit.[2]

Mr. Alexei's arguments in favor of a more flexible default rule rely in large part on his fear that the default rule we adopt today could leave attorneys unpaid for significant work if their client terminates the representation before the attorney completes the job. As Disciplinary Counsel points out, however, attorneys may recover for uncompensated work through a quantum meruit action. *See, e.g.*, *Ginberg v. Tauber*, 678 A.2d 543, 544 (D.C. 1996) (involving a quantum meruit action brought by an attorney against their former client for "the reasonable value of the services [the attorney] provided"); *Jonathan Woodner Co. v. Laufer*, 531 A.2d 280, 287 (D.C. 1987) (clarifying that appellant, an attorney, could recover under a quantum meruit theory if he "present[ed] proof of the reasonable value of the services rendered in advancing" the client's goal). Or, if the parties have agreed to

---

[2] That is not to say that it is impossible to determine the reasonable value of the partial services provided by an attorney. As referenced below, courts frequently do just that in quantum meruit cases, and those cases provide for an important remedy where a client refuses to pay for partial services. But such a suit does not require an attorney to make a unilateral determination about the value of the partial services rendered. And the penalty for an inaccurate determination is a discrepancy in the funds awarded as relief in quantum meruit, as opposed to the potential of disbarment for intentionally or recklessly misappropriating client funds (if the Hearing Committee concludes it is reckless or intentional) or another disciplinary sanction. *See In re Addams*, 579 A.2d at 191.

arbitrate their fee disputes, the attorney may file a petition with the Attorney/Client Arbitration Board. Attorneys, therefore, are not without remedy against a client who declines to pay for partial services.

Because the default rule we announce above—that advances on flat fees are earned upon the completion of all the legal services bargained for in the flat fee—is novel, we pause to explain how attorneys may deviate from that default rule and the interplay between those deviations and other professional conduct rules. Attorneys may depart from the default rule we establish in two distinct (but not mutually exclusive) ways: they may (1) specify in the agreement when and how portions of the flat fee are earned or (2) obtain informed consent from the client to treat unearned fees as their attorney property.

The first option, specifying when and how portions of the flat fees are earned, allows the attorney to actually earn portions of the fee before completing the full representation. For example, the agreement might provide that the attorney earns the flat fee at an hourly rate set forth in the contract up to but not exceeding the total flat fee. This is essentially what Mr. Alexei advocates for as a default rule, but it comes with the added benefit of specifying what the hourly rate is and how the fees will be earned. Or, as was the case here, the agreement might involve multiple discrete legal services—here, three separate filings—and attach a separate price for

each service that sums to the total flat fee. Under such a contract, an attorney would earn the portion of the flat fee attributable to each separate legal service upon completing that project.[3] Or, the agreement might provide that after the attorney submits, say, a first draft of a legal brief to the client for approval, they earn a percentage of the flat fee. These agreements, by deviating from the default rule, would allow attorneys to earn portions of the advanced flat fee as they worked on the client's behalf. The rate at which the attorney earns the fees—whether hourly, by milestones, or by some other measurement—would still need to comport with the separate ethical requirement that the fees be reasonable. *See* D.C. R. Pro. Conduct 1.5(a). The attorney would not, however, need to secure informed client consent for this arrangement under Rule 1.15(e). They would only need to comply with the requirements of a valid contract and any other applicable ethical rules. That is because, as discussed above, informed consent under Rule 1.15(e) does not affect whether a fee is *earned* but rather only what an attorney may *do* with *unearned* fees. *Id.* 1.15(e); *see supra* Part II.A.

The second, distinct option available to attorneys is to treat unearned fees as attorney property with the client's informed consent. Under this approach, the

---

[3] Although Mr. Alexei's flat fee encompassed multiple different filings, each with their own specified price, he does not represent that he completed any of the filings at the time he first removed the funds from the client account. Accordingly, he cannot rely on this understanding to explain his conduct.

attorney does not earn the fees until after they complete all the legal services (or an alternative arrangement set forth in the contract), but they may use the unearned fees for personal ends because their client has allowed them to treat the funds as attorney property. Unlike the first approach, this requires that the attorney meet the strictures of informed client consent outlined in *In re Mance*. *See* 980 A.2d at 1206-07 (explaining the requirements for informed consent to allow an attorney to use unearned client funds); *In re Ponds*, 279 A.3d 357, 361-62 (D.C. 2022) (per curiam) (applying *In re Mance*'s informed-consent requirement and concluding that the attorney's fee arrangement was "fundamentally incompatible with the requirements of *In re Mance*"). On the other hand, the amount of unearned funds treated as attorney property need not comply with Rule 1.5's reasonable-fee requirement, because it is not itself a fee; the attorney is not earning the money. As we contemplated in *In re Mance*, an attorney could, with informed client consent, treat the entire advanced fee as their own property immediately, 980 A.2d at 1206—even though it would presumably be unreasonable to charge the entire amount of the fee in exchange for no work yet performed—because treating the unearned money as attorney property is not the same as charging or earning a fee. Because these funds remain unearned, however, if a client terminates the attorney, the attorney must promptly return all unearned funds—including those they were authorized to treat

as attorney property during the representation. *See* D.C. R. Pro. Conduct 1.15(e); *In re Ponds*, 279 A.3d at 361.

### C.    Prospective Application of the Holding

Although we hold that, as a default rule, advanced fees are earned upon the completion of all the legal services associated with the fees, we also concluded that *In re Mance* did not resolve this question. Accordingly, we "announce this interpretation of the rule for the first time." *In re Mance*, 980 A.2d at 1199. In bar disciplinary cases like this, we have seen fit to apply such holdings "prospectively." *Id.* To be sure, our holding here is not the same sea change that *In re Mance* was. But, as both Mr. Alexei and the Board point out, D.C. Bar Ethics Opinion 355, which at least for a time was published on the D.C. Bar's website, interpreted *In re Mance* to permit attorneys to earn advanced fees before the completion of the legal services. *See* D.C. Bar. Comm. on Legal Ethics, Opinion No. 355, at 342 (2010) ("*Mance* does not address whether a lawyer may transfer some portion of a flat fee from a trust account to an operating account prior to the conclusion of a representation where there is no agreement between the lawyer and the client. . . . A lawyer who has charged a client, for example, two thousand dollars for the preparation of an estate plan has under most circumstances earned some portion of the fee when the lawyer sends the client a set of draft documents."). Although this opinion was later

removed from the D.C. Bar website, it reflects the ambiguity following *In re Mance* on this question and may have guided attorneys who read it at the time but did not notice its withdrawal.

In light of (1) the novelty of our holding, (2) the Board's recommendation to apply such a rule prospectively, and (3) the prior existence of a contrary Ethics Opinion, we apply our holding prospectively so as not to reach whether Mr. Alexei's conduct or any other similar fee arrangements predating the issuance of this opinion violated Rule 1.15.

### III.  Conclusion

For the foregoing reasons, we hold that, as a default matter, advances on flat-fee payments are earned only upon completion of all the agreed-upon legal services, and we apply this holding prospectively such that it does not apply to Mr. Alexei or any agreements already in force before the issuance of this opinion.

*So ordered.*